<hr />

MARY CHAMBERLAIN

*v.*

STROUD H. CHAMBERLAIN.

[Argued January 9th, 1905. Decided January 23d, 1905.]

The complainant and defendant were formally married, and entered into matrimonial relations in good faith, believing that the complainant was a widow, whereas she had a former husband living; but, in order to place the legality of their relations beyond question, the complainant procured a divorce from her lawful husband, after which the defendant, in the presence of witnesses, assured complainant that she was his legal wife, and that no further ceremony was necessary, and thereby induced complainant, in reliance upon such representations, to remain with him, cohabiting with him as his wife for over twenty years.—*Held*, that the relation of husband and wife between them began when the decree of divorce was obtained, and that the defendant is estopped to deny that he had intended to enter into marriage relations with the complainant.

On bill, answer, replication and proofs.

*Mr. Peter McGinnis* and *Mr. John M. Ward,* for the complainant.

*Mr. Elmer King,* of the firm of Vreeland, King, Wilson & Lindabury, for the defendant.

STEVENSON, V. C. (orally).

This bill is filed under the twentieth section of our Divorce act by Mary Chamberlain against Stroud H. Chamberlain, who she alleges is her husband, charging that he has abandoned her, and neglected and refused to support her, and praying for the statutory relief afforded in such a case. The answer contains an attempt, as I recall it, to answer the charges of misconduct set forth in the bill of complaint, but sets up as a complete defence —and this is the only defence which is supported by proof so as to call for consideration—that the defendant is not the husband of the complainant, and therefore is not liable to the statutory action, and is not liable to discharge the common law duty which a husband owes to the wife in respect of support.

The brief for the defendant, which is very voluminous and discusses a large number of cases, presents at the start the following as the history of the case:

"William Tissell and Mary Walsh [Mary Walsh being now the complainant, Mary Chamberlain] were married March 29th, 1871. William Tissell left Mary Tissell and went to St. Louis, and thence to Oak Grove, Texas, March 12th or 15th, 1877. About July, 1877, a letter was received by Mary Tissell from William Tissell. Mary Tissell, under the name of Mary Walsh, was married to Stroud H. Chamberlain, April 4th, 1880. Mary Chamberlain, under the name of Mary Tissell, filed a petition for divorce in this court, sworn to by her, May 8th, 1880, and decree of divorce granted thereon June 30th, 1881. From time of marriage to Stroud H. Chamberlain, in 1880, both lived and cohabited together as man and wife until defendant left her, in March, 1903. There was no issue born of the marriage. Both complainant and defendant believed the first husband, William Tissell, was dead until after these proceedings [that is, the proceedings in this present suit] were instituted, when that he was alive was discovered by the defendant. William Tissell, the first husband, was, at the time of the filing of the bill and the hearing of this case, living at Oak Grove, Texas."

The foregoing extract which I have read from defendant's brief states the leading facts. The intention undoubtedly is to state, in accordance with the proofs, that both the complainant and the defendant, at the time of their attempted marriage, April 4th, 1880, had been informed and verily believed that the complainant's first husband, William Tissell, was dead, and that they both held such belief continuously until after this suit was commenced. I will add here that the affidavit of a man, purporting to be the affidavit of William Tissell, the complainant's first husband, sworn to in Texas—an *ex parte* affidavit—was admitted by stipulation as evidence in the cause, to have the same force as a deposition of the affiant taken *de bene esse.* There was no objection made to the use of the affidavit as evidence, it being apparent that the affiant was not within the reach of the process of the court at the time of the hearing. This affidavit is signed by a person calling himself William Tissell, and the signature indicates that the affiant was an illiterate person. The complainant testified that when her first husband left Paterson, being at that time perhaps about forty years of age, he could neither read nor write. There were other circumstances which perhaps cast some slight doubt upon the affidavit of this man William Tissell—which perhaps create or sustain some slight doubt as to whether the William Tissell who signed this affidavit was the William Tissell who left Paterson in 1877. The affidavit apparently was prepared in New Jersey and sent to Texas to be signed. The testimony of the complainant, which was not objected to, showed that notice of the pendency of the divorce suit was given by mail, and that the notice was returned in the envelope in which it was mailed, and this original envelope was put in evidence in this cause. The affidavit of this William Tissell states in substance that he received notice of the suit by mail. I do not think, however, as the case stands, that the proposition is open to dispute that in point of fact the complainant's first husband was living when this *ex parte* affidavit was made. I shall deal with the case upon that supposition.

We have, then, the case of a man and woman who undertook to enter into the marriage relation with each other on April 4th, 1880, both parties believing in good faith that they were com-

petent to enter into that relation—that each of them had the capacity to marry the other—while, in fact, one of the parties, the complainant, the woman, was under a disability on account of her having a husband then living. These two parties, entertaining such belief, were married by a clergyman in the city of Brooklyn, and thereupon began living together as man and wife, and continued to cohabit as man and wife, holding themselves out to the world as married, each recognizing the other as his or her lawful spouse for a period of twenty-three years. The proofs, I think, indicate that before the complainant undertook to marry the defendant, she went, with his knowledge, to counsel and instructed him (the counsel) to institute a divorce suit against her former husband, William Tissell, whom she believed to be dead. Without waiting, however, to obtain the decree, which was subsequently obtained, divorcing her from Tissell on the ground of desertion, she undertook to enter into the marriage relation with the defendant. Both parties appear to have had full knowledge of all the facts. The complainant relied upon the statements of two persons to the effect that Tissell was dead. The affidavit of one of these persons, George B. King, has been put in evidence by consent. This witness testifies that he went to Texas in the spring of 1880 and, at the request of the complainant, made inquiries for Tissell; that he made such inquiries, but discovered nothing about Tissell's whereabouts, and that when he came back he told the complainant that he could not find Tissell and he must be dead. The complainant testified also that one Pierson Vreeland, now deceased, a former resident of Paterson and a man of substance and good repute, upon his return from a journey, assured her that he had learned in Texas that Tissell was dead. The complainant testifies that she informed the defendant of what Mr. Vreeland had stated to her. Mr. Vreeland was the former employer of the defendant, and evidently a friend or friendly acquaintance of both parties. The defendant, so far as his testimony shows, made no effort to inquire from Mr. Vreeland, as he might have done—to question him about the extent of his investigations in Texas and the source of his information in regard to Tissell's death. Both of these parties acted upon this hearsay evidence, and appear to

have acted in good faith. It is important to note that there is no suggestion that the complainant made any intentionally false or fraudulent statement to induce the defendant to marry her. Apparently the defendant had open to him all the sources of information which the complainant had in regard to the question whether Tissell was dead or not.

After the decree of divorce had been obtained in June, 1881, the complainant and defendant were living together, and some question was raised among the women who were living in the same boarding-house, or living near these parties, in regard to Mrs. Chamberlain's status. The complainant was then known, and had been known and always was known, after her marriage in April, 1880, as Mrs. Chamberlain, and was regarded as the defendant's wife.

Without undertaking to state the testimony of the complainant and the defendant and the two women who were called as witnesses in regard to the matter, I think I can state the substance of what is proved when I say that the defendant exhibited the decree of divorce which the complainant had obtained from Tissell in order to stop all gossip in regard to his relations with the woman who passed as his wife. He gave the most positive assurances to the complainant, in the presence of these witnesses, that the complainant and himself were legally married; that she was his lawful wife, and he evidently referred to the decree of divorce as establishing the legality of the relation which he apparently sustained to the complainant. It does not appear that the defendant allowed either of these two women to learn that the date of the divorce was over a year later than his attempted ceremonial marriage with the complainant. It may be that the defendant, recognizing the difficulty of establishing the lawfulness of his marriage by proving the death of Tissell, adopted the more convenient expedient for satisfying the scruples of his neighbors which was afforded by the decree of divorce. Unless these neighbors knew the dates of both the marriage ceremony and the divorce, the defendant's bold production of the decree of divorce would naturally be accepted as absolute proof of the lawfulness of his relations with the complainant, while the mere statement that it had been reported that Tissell

died in Texas at some time within the three years preceding the marriage would have been regarded by these worthy people as a very doubtful warrant for so early a re-marriage by Tissell's wife. The complainant testifies that the reason why she got the divorce was because it was suggested that it would be convenient in case she or Mr. Chamberlain, her husband, should thereafter acquire property. There are indications also that one object of the decree of divorce was to establish the legality of the relations of these two parties in case the unexpected event should occur that proof should be made that Tissell was alive. I shall not deal in detail with this matter, because both of these parties most positively testified that they believed that their original marriage was absolutely valid, and that Tissell was then dead, and that they never believed otherwise until after this present suit was commenced.

When the decree of divorce was obtained in June, 1881, these two parties for the first time became capable of marrying each other. They thought, as they both swear, that they were capable of marriage at the time of the ceremony, April 4th, 1880. That is proved to have been a mistaken belief, but when the decree of divorce was obtained in June, 1881, then they became for the first time capable of entering into the marriage relation with each other. They continued, after the complainant's disability had been removed, to live as man and wife until March, 1903, a period of nearly twenty-two years. During all that time they treated each other as husband and wife. The proof of continuous, unbroken matrimonial habit and repute is beyond doubt or question. They attended church together; they were received in the little church circle and social circle in which they moved, where all their friends and neighbors were evidently reputable, respectable people, as man and wife, and, as I have stated, neither of them had a doubt, according to the testimony of both, that they were man and wife during all that period. They may have —I may say they did have—a mistaken notion as to the date when their marriage took place, as to the date when the relation of husband and wife began to exist between them. They thought such relation dated from April 4th, 1880; as a matter of fact, it

could not have begun at that time, and could not have begun until June, 1881, when the decree of divorce was obtained.

The controverted question in this case is whether, under the circumstances that I have stated, the relation of husband and wife between these parties was created at any time after the disability of the complainant to contract marriage with the defendant had been removed by the decree of divorce, in June, 1881. In my opinion, upon the facts stated, the relation of husband and wife betwen these parties did begin—was created—at the time when the decree of divorce rendered it possible for them to marry. I am also of opinion that if this first conclusion is erroneous, the relation of husband and wife began to exist a short time after the decree of divorce was obtained, when the defendant assured the complainant that it was not necessary to have any further ceremonial marriage between them—assured her that she was his legal wife; gave her this assurance in the presence of witnesses, and thereupon, in reliance upon such representations and statements of the defendant, the complainant remained with him, cohabiting with him as his wife from year to year.

Apart from any proof, which perhaps can be derived only from the testimony of the complainant, that there was an attempt made between these parties after the divorce had been obtained to make a formal contract of marriage, and apart, also, from the evidence from the statements proved to have been made by the defendant in regard to his relations with the complainant after the decree of divorce which goes to show an actual consent on his part, concurrent with a similar consent of the complainant, to the establishment of the marriage relation, I think the whole conduct of the defendant, including particularly those statements in reliance upon which the complainant refrained from demanding a second marriage ceremony, and in reliance upon which she continued to live with him as his wife, make out, or would make out, if necessary, an estoppel against the defendant, so that the result would be that the defendant must be held to have intended to be the husband of the complainant, concurrently with a similar intent on her part to be his wife, whether he had actually such an intent or not.

There are three principal classes of cases which have come up in the courts where a man and woman have undertaken to establish before the world the status of marriage by a formal ceremony and have continuously thereafter cohabited and held themselves out to the world as man and wife, when, in fact, at the time of the ceremonial marriage one of them had a wife or husband already living, but where such incapacity during the course of the cohabitation has been removed by the death of the former wife or husband or a decree of divorce has been obtained dissolving such former marriage. One class of these cases is illustrated in *Campbell* v. *Campbell, L. R. 1 H. L. Sc. 182,* commonly referred to as the *Breadalbane Case.* In that case a man eloped with a married woman and lived in adultery with her. Subsequently the woman's husband died, and this man and woman continued to cohabit as they had formerly done, holding themselves out to the world as they began to do at the time when they first lived together in adultery—as husband and wife. The house of lords found that under the circumstances of that case the true rule would establish the marriage between these people who were treating each other as husband and wife at the time when they first became capable of entering into such relation. The doctrine of this case was rejected by our court of errors and appeals in the case of *Collins* v. *Voorhees,* to which I shall next refer, and which belongs to the second class.

The case of *Collins* v. *Voorhees,* which I have before me, reported in the court of chancery under the name of *Voorhees* v. *Voorhees' Executors, 46 N. J. Eq. (1 Dick.) 411,* and in the court of errors and appeals in *47 N. J. Eq. (2 Dick.),* on *p. 315,* where the dissenting opinion of Mr. Justice Garrison appears, and on *p. 555,* where the opinion of the court of errors and appeals appears, through Chief-Justice Beasley, presented these facts: The man Voorhees obtained a fraudulent and void divorce in Connecticut from his wife, who resided in New Jersey. He knew that his suit and decree were a gross fraud on his wife and on the court. He exhibited this decree of divorce to a woman in Massachusetts and she, honestly believing that he was lawfully divorced, was publicly married to him in a church, and thereafter continuously, for some years, cohabited with him as his

wife, and was held out as his wife and bore to him two children. As a matter of fact, a few months after this marriage, Voorhees' wife in New Jersey heard of the fraudulent divorce which had been obtained in Connecticut and appeared in the cause and had the decree opened—had permission to file a cross-bill—and the result was that the original decree obtained by Voorhees was vacated as fraudulent, and a decree of absolute divorce was granted to the New Jersey wife. This decree, of course, rendered Voorhees capable of marrying his Massachusetts wife. Voorhees, however, for manifest reasons, did not inform the woman who was living with him as his wife in innocence, supposing that the marriage was lawful, that the decree of divorce had been set aside; he did not propose to have another marriage ceremony; he concealed, fraudulently, from the woman with whom he was living the fact that he had been incapable of marrying her when he undertook to do so, and that by the decree of divorce he had been rendered capable of such marriage. He went on for years enjoying all the fruits of his marriage, or attempted marriage, with this Massachusetts woman. In reliance upon his representations that he was her husband, and innocent of any wrongful intent, this woman surrendered herself to him and gave him all the advantages of marriage with her, and, of course, debarred herself from marriage with any other man. The decision of the court of errors and appeals, affirming the decree below in this case, was that the relations of Voorhees with the Massachusetts woman were not matrimonial at the start, because, of course, they could not be; but the decision goes further and holds that the relations between Voorhees and this woman, when by the decree of divorce he had been rendered capable of marrying her, continued to be meretricious; that the matrimonial habit and repute after the divorce had been obtained must be referred back to the origin of the relations between these people.

The court seems, in the opinion, to treat the case as belonging to the same class as the *Breadalbane Case,* where the relations between the parties—the man and woman—at the start, were known to both to be meretricious.

It has always seemed strange to me that in the opinions of the learned judges in this court, and in the court of errors and

appeals in this *Voorhees Case,* no reference is made to the law of estoppel, the great doctrine which is so potent in our law for the redress and prevention of fraud. The case goes altogether upon the actual intent of Voorhees. In the *Breadalbane Case* the intent of both parties at the time the relations were established between them was to live in adultery, while they covered up their criminal relations by presenting the appearance of man and wife before the world. In the *Voorhees Case* the intention of this innocent woman was to enter into the lawful state of marriage with Voorhees. He committed a gross fraud on her in obtaining possession of her and causing her to sacrifice her life to him, but she was not to blame. It has always seemed strange to me that no one suggested that Voorhees was estopped to deny that he consented, concurrently with this woman, to enter into the marriage state when he had in the most solemn manner represented to her that he in fact did enter into that state with her, and in reliance upon that representation she had acted so much to her injury, and that in accordance with the familiar rule such estoppel became operative when he became capable of doing what he had falsely pretended to do.

I know of no reason why the doctrine of estoppel *in pais* should not be applied in dealing with the consent which is necessary—the concurrent consent of a man and woman capable of contracting that the marriage relation shall be established between them. A meeting of minds is necessary, generally speaking, in order to a valid contract, but oftentimes what courts enforce is not the thing which two parties have actually agreed upon; what they enforce is the obligation arising from the consent of one and the estoppel against the other to deny a corresponding consent. Suppose a man takes a woman before a clergyman or a magistrate and undertakes to go through a ceremonial marriage, and instead of answering affirmatively the most important question in the ceremony, answers negatively by adding the word "not" just loud enough for two or three convenient witnesses to hear. To make the case plainer, suppose he adds, between other responses, statements to those witnesses to the effect that the whole proceeding is a sham; suppose he then leads the woman to the church door and abandons her there and states that the whole

proceeding has been a farce. We may concede that there is no marriage between them; we may concede that the case is similar to the one which has been dealt with in our courts quite frequently where both parties have gone through an apparently valid marriage ceremony, but in jest and without matrimonial intent. But suppose the man consummates this marriage—takes the woman to himself before the world as his wife—can there be any question that he would be estopped to deny that he had consented? Suppose, to take another case, a man and woman enter into a written contract of marriage, and by some obscure use of words, or by the use of ink which is not visible at the time the contract is signed, it is made to appear that the man had no intention whatever to enter into the marriage state with the woman. If she acts in good faith and relies on his representations and yields herself to him as his wife—gives up all her other opportunities of marriage—would he be allowed to prove his actual intent at a later time?

I do not think that I ought to hold that the court of errors and appeals meant to exclude the operation of this great equitable doctrine of estoppel from all consideration in determining whether an effective concurrent consent has been given between a man and woman in order to establish the marriage state. It seems to me, if the case settles anything on this subject of estoppel, it establishes *sub silentio* that the particular facts in that case did not make out an estoppel against Voorhees.

The third class of cases of the kind to which I have referred embraces those where the disability on the part of one party exists, but is unknown to either, and where both parties in good faith believe that no disability in fact exists, and therefore actually intend to enter into the marriage state. That is this case. In the opinion of Chief-Justice Beasley in the *Voorhees Case,* it is distinctly admitted that in such a case as is now before this court a subsequent removal of the incapacity of one of two parties marks the commencement of a valid marriage between them. He distinguishes such a case as this from the *Breadalbane Case,* and the distinction is perfectly plain. Referring to the opinion of Lord Westbury in the *Breadalbane Case,* the chief-justice uses the following language (I read from *p. 558*): "He

[that is, Lord Westbury] does not pretend that he can find anything in its favor [that is, the doctrine which he lays down], and in his remarks he strangely compares the case before him with those instances where the parties intended originally to marry and not to commit adultery, their intent being frustrated by the existence of some unknown obstacle. And yet it is presumed that no one who will look with any care into the subject will have the slightest doubt that these two classes of cases, with respect to the methods of their proof, respectively rest upon entirely different foundations, for when the parties have intended marriage, being ignorant of an existing impediment, all that is to be established by cohabitation apparently matrimonial subsequent to the removal of such impediment is the carrying into effect by the parties of their original purpose; but when the original purpose was to live in adultery, the evidence under similar circumstances must be sufficient to show an abandonment of such purpose and the commencement of a new one. These lines of cases can be confounded only by want of careful observation of the principles upon which they rest."

It seems to me that the distinction which Chief-Justice Beasley so sharply draws between the *Breadalbane Case* and this *Chamberlain Case* now before this court is perfectly plain. The strange thing to me, which perhaps may be due to my inability to analyze these cases correctly, is that the great chief-justice should have supposed that the *Breadalbane Case* and the *Voorhees Case* are in the same class. In the *Breadalbane Case* the original purpose of both parties was to live in adultery, covering up their adulterous connection by the false appearance of marriage; in the *Voorhees Case* the unfortunate woman had no criminal intent, but from the start intended to live in marriage relations with the man who pretended that he could marry her. As I said before, no one suggested that this man Voorhees might or ought to have been held estopped to deny his matrimonial intent at the first moment when the matrimonial intent on his part became possible. In my opinion, there is almost as wide a distinction between the *Voorhees Case* and the *Breadalbane Case* as there is between the *Breadalbane Case* and this *Chamberlain Case.*

I think that Chief-Justice Beasley, speaking for the court of errors and appeals, plainly admits that in a case like this, where the parties come together and in the most solemn manner accept each other as husband and wife, and concurrently intend to establish that relation, and manifest that concurrent intention in the usual solemn form before a clergyman or a magistrate, they do not intend to live in adultery; and if, in fact, by reason of an unknown impediment, an unknown incapacity on the part of one of them to contract the marriage which they have attempted to contract, they have begun in fact to live in adultery, then, upon a subsequent removal of the impediment, if they continue to cohabit as man and wife, continue to live in precisely the same way in which they began to live together, such subsequent continued cohabitation must be deemed matrimonial in accordance with the original intent, and cannot be deemed illicit in accordance with an intent which neither of them ever had.

The three classes of cases which I have described seem to me to be essentially distinct from each other. In the first class, of which the *Breadalbane Case* is the type, both parties know of the impediment; both intend not to marry, but to live in adultery; both intentionally make a false pretense of marriage before the world in order to conceal their meretricious relation.

In the third class, to which this case and the case of *De Thoren* v. *Attorney-General, L. R. 1 App. Cas. 686,* cited by Mr. Justice Garrison in his dissenting opinion, belong, both parties are ignorant of the impediment; both intend in good faith to marry and do not intend to commit adultery; both believe that they are in fact lawfully married, and both make an honest representation to the world to that effect.

In the second class, which is intermediate between the others, and to which the *Voorhees Case* belongs, one of the two parties is in the situation of both parties in the *Breadalbane Case,* and the other party is in the situation of both parties in this *Chamberlain Case* and the *De Thoren Case.*

In determining the effect on the status of the parties in each of these classes of cases which is produced by the removal of the impediment while the cohabitation apparently matrimonial con-

tinues, it seems to me that a rule laid down in one of the classes of cases may be plainly inapplicable to either of the others. The three situations seem to be widely variant and to call for the application of radically different principles of morals and public policy. Of course, if the rule be laid down sustaining the validity of the marriage in the *Breadalbane Case,* such rule may be said to apply *a fortiori* to the other two cases; but if the rule be laid down adversely to the marriage set up in the *Breadalbane Case,* such rule is entirely inapplicable to this present case and to the *De Thoren Case,* as Chief-Justice Beasley so distinctly points out, and I cannot help saying that, in my humble opinion, such rule would be also inapplicable to the *Voorhees Case,* the second class of cases, unless we are to reject, in the consideration of those cases, the doctrine of estoppel *in pais* and demand for a lawful marriage an actual, concurrent consent of the two parties in every case.

In this present case the declarations which are proved to have been made by the defendant after the impediment had been removed by the divorce greatly strengthen the presumption that the relations between these two persons after the divorce became lawful relations—matrimonial relations—and not illicit relations, as in fact they had been theretofore. The testimony of the two women to which I have referred makes the case very much stronger than if the parties had merely continued together after the removal of the impediment. These declarations amount to an affirmance in the most solemn manner on the part of the defendant of the lawfulness of the relations existing between himself and the complainant.

If I am right in the view which I have expressed in regard to the application of the great doctrine of estoppel in cases like this and in cases like the *Voorhees Case,* in establishing a lawful marriage by preventing one of the parties from denying that he or she concurrently with the other consented to the establishment of the status of marriage between them, as I think I intimated earlier, there is another ground upon which the marriage between these parties may be rested. If the marriage should be established for this reason, then, as I said, it would date not from the removal of the disability, but from the time when the

defendant made the representations to the complainant that he was her husband and she was his wife, and that no further marriage ceremony was necessary between them, and the complainant acted on those representations. Even if we might suppose that these declarations are not evincive beyond doubt of the matrimonial intent on the part of the defendant; if there is any theory of the case upon which it might be held that the intent of the defendant in living with this woman in the apparent relation of marriage after the divorce had been obtained was not *bona fide,* and that his intent in maintaining those relations must be referred back to the actual state of things when the marriage ceremony was performed, I strongly incline to think that the defendant should be held estopped to deny the existence of the matrimonial intent which he manifested so distinctly when he persuaded this woman that no further marriage was necessary and induced her to continue living with him as his wife. She acted upon the intent which he manifested to her, and it seems to me that sound law—sound morals—require that the defendant, whatever his actual intent might have been, must be held estopped to deny the intent which he exhibited and manifested beyond doubt by representations upon which the complainant acted for years. This case can plainly be distinguished from the *Voorhees Case* on account of the positive representations and assurances which the defendant made directly to the complainant after her divorce had been obtained, and upon which she acted in continuing to cohabit with him as his wife. I am bound, whatever my private opinion may be, to apply the law of the *Voorhees Case* while that case stands not overruled, nor even modified, but I am not bound to extend the law of that case to other cases presenting a substantially different state of facts. The *Voorhees Case,* which is entirely silent on the subject of estoppel, certainly cannot be deemed authority in this state for the proposition that actual consent of the two parties is invariably necessary to effect a marriage between them, and that a lawful marriage cannot rest upon the consent of one of the parties and an estoppel preventing the other party from denying the existence of a similar concurrent consent. The great doc-

trine of estoppel, which is one of the finest developments of equity, has never been limited in New Jersey in that way.

I have perhaps said too much about the doctrine of estoppel in its application to this case, because, apart from that doctrine, I think the decision of this present case may be rested firmly upon the proposition that the proofs show beyond the shadow of a doubt that from the date of the divorce in this case, which removed this woman's incapacity to marry, the man and woman lived together as husband and wife, believing that they were husband and wife, consenting that the status of marriage should exist between them, and believing that such marriage status did exist. This, in my judgment, makes a marriage, and it is immaterial whether there was a particular date when some ceremony was pronounced between them or some form of words was employed. It is enough if they concurrently intend that the marriage status shall exist between them and each knows that the other so intends; all the rest is a mere matter of proof.

These people lived together as man and wife in the way I have described for nearly twenty-two years; they then have a disagreement; the husband abandons the wife; this suit is brought; the husband then for the first time learns something which sets him upon an inquiry, and the result is that he finds out that this man Tissell is alive; he finds out that when he thought, and had always thought down to that time, the marriage status was established between himself and the woman whom he regarded as his wife, such status was not in fact—could not have been in fact—established because of the existence of a disability on the part of the woman which at the time he thought did not exist. The defendant does not pretend that he had not, from June, 1881, down to March, 1903, lived with this woman as her husband, and intentionally maintained relations with her which he regarded as lawful marriage relations and were regarded in like manner by her, or that each party did not know how the other regarded those relations. In brief, he does not pretend, nor would the proofs support the pretense, that during all this period these two people were not concurrently intending to occupy the relation toward each other of husband and wife.

In dealing with the subject of estoppel, when applied to the

class of cases to which the *Voorhees Case* belongs and to cases like the present one, I think I failed to make one point plain. I have not suggested that if a man fraudulently conceals his incapacity to marry, and persuades an innocent woman to go through a marriage ceremony with him and afterwards live with him as his wife, that an estoppel will operate so as to effect a marriage, without reference to his actual intent, in case, before the incapacity has ceased to exist, he separates himself from the woman and makes no further pretensions that the marriage relation exists between them. In such a case the man may be conceded to be competent to contract a lawful marriage with another woman. It may be conceded in this case that, prior to the time when the complainant obtained her divorce from Tissell, the defendant might have separated himself from her and might have declined to recognize her as his wife, and might have contracted a lawful marriage with another woman. There are a number of questions which I have not even considered presented by the case where the continuous representation made by the man to the woman that their relations are matrimonial, and dating, for instance, from a formal ceremony of marriage, altogether cease before a marriage becomes possible by the removal of an obstacle. I have only intended in this case to indicate the opinion that where the originally false representation made by the man to the woman upon which she has acted is continued, and she continues to act upon it after the representation can truthfully be made, then the estoppel begins to operate.

My conclusion is that the complainant is entitled to a decree which will make the defendant liable under the statute to provide for her support and maintenance. The abandonment and neglect and refusal to support are proved in this case beyond doubt, and the decision which I have rendered disposes of the only defence which is worthy of consideration.

My recollection is that the parties agreed that if the decree of the court should be favorable to the complainant, an order of reference should be made to ascertain the amount of the alimony to which she is entitled. I will hear counsel, however, on that matter on settlement of the decree, if they do not agree upon the form of the decree.