The surrogate of Hunterdon county on May 8th, 1928, granted letters of administration to August Franchi, a brother of Celestine Franchi, who died on April 19th, 1928, leaving her surviving her brother, August Franchi, and three sisters, Clementina Franchi, Mary Winant and Stella G. Potuto.
Six years later on March 14th, 1934, on the petition of the respondent, John Ferrari, the surrogate ordered the appellants August Franchi, Clementina Franchi and Mary Winant, and Stella G. Potuto, also one of the respondents, to show cause by the letters of administration granted to August Franchi should not be revoked on the ground that the same *Page 458 
were issued without notice of the petitioner, who alleged he was the husband of the decedent and the person firstly entitled thereto, and that such letters of administration were procured through fraud. The hearing before the surrogate resulted in an order revoking the letters of administration theretofore granted to appellant, and this is an appeal from that order.
The single question presented is whether John Ferrari was the husband of the decedent at the time of her death on April 19th, 1928.
Ferrari married Ida Nava, a widow, on September 24th, 1891. At the time of her marriage, Ida had a daughter Mary (now Mary Ciccone) by a former husband, who was fifteen or sixteen years old. John, Ida and the daughter Mary lived together for about one year when, as Ferrari describes it, we had "a little fight" and, "I took my clothes and I got out." The daughter Mary says what happened was that "they quarreled because he didn't work, * * * my mother chased him out."
Ferrari met the decedent Celestine Franchi in 1890 at which time he obtained employment with her father, Giovanni Franchi. He was dismissed from that employment in 1904 but continued on friendly terms with the Franchi family. In 1903 or 1904, Ferrari says, that Celestine came to his home on Sullivan street, New York, and insisted on remaining with him, saying: "`No; I don't want to go home.' `I want to be your wife. Do you want to be my husband'? I said, yes. I will be glad to do it. She was a beautiful woman, a nice woman, and we started to be together and I moved over there and took my bed and all my stuff and brought it to 21 McDougal street, New York City." He says he lived with Celestine at the home of her mother and father "in the garret" for about eleven years until 1916, when Celestine purchased a farm in Hunterdon county where he lived with her until the time of her death.
The surrogate found that Ferrari was the husband of Celestine and so entitled to administration over her estate. He rested his decision upon (1) that there was a common law marriage; and (2) that the parties possessed the capacity to make such an agreement notwithstanding the prior ceremonial *Page 459 
marriage of Ferrari to Ida Nava. The surrogate did not have before him at the time he decided the matter the testimony of Mary Ciccone that her mother was alive at the time of the alleged common law marriage and did not depart this life until February 21st, 1919. The testimony of this witness was taken de beneesse pursuant to an order of this court.
Some twenty-six witnesses, neighbors, friends and businessmen testified on behalf of the petitioner that Ferrari and Celestine Franchi were respectively introduced and known to them as husband and wife. In addition the petitioner introduced letters in evidence written by Celestine and signed "Mrs. John" as well as letters addressed to her as "Mrs. John" and receipted bills made out to "Mrs. John." On the other hand, there are a number of letters in evidence which decedent signed "Celestine Franchi," one as late as September 26th, 1927, to John J. Fallon, Jr., a member of the bar, signed "(Miss) Celestine Franchi." Celestine's two sisters, Clementina Franchi and Mary Winant, and her brother say they never heard the decedent nor Ferrari refer to one another as husband and wife, and so far as they are concerned, the only relationship which Ferrari sustained to their sister and members of her family was that of a friend and trusted employe. They deny that Ferrari lived with their sister "in the garret" in the home of their parents.
Decedent in her lifetime wrote letters to the late Willard C. Parker, a member of the bar of this state, who, while he lived apparently was her counsel, which letters she signed "Celestine Franchi." In one of these to Mr. Parker, dated December 22d 1922, she wrote:
"In regard to what you have mentioned in your P.S. of the16th inst. will say that quite a number of persons in Flemington and other places call me Mrs. Ferrari but I neveraffirm or deny. Mr. Ferrari has worked a number of years for my parents and about fifteen years for me — both in the antique business and at present manages the farm for me, and as I am alone with him quite a number of persons believe we are married. Of course these are private and personal matters which I never explain only to intimate friends or where it is compulsory. To you Mr. Parker I am telling the truth that I am single." (Italics mine.) *Page 460 
George R. Parker, a son of Willard C. Parker, saw Ferrari in his father's office on a number of occasions with Celestine and heard Celestine acknowledge before his father deeds of conveyance which she executed as a single woman in the presence of John Ferrari. She purchased farms in 1917, 1920 and 1921, and maintained bank accounts as "Celestine Franchi." On July 28th, 1926, she executed a deed as "Celestine Franchi" to her brother, August Franchi. During the years Celestine mailed Christmas and Easter cards to her friends under the name of "Celestine Franchi." In December, 1925, she joined with her sisters and brother in a claim in the New York supreme court in her maiden name, in which court the city of New York sought to acquire title to certain property for the extension of Sixth avenue. Her sister, Clementina, made the arrangement for her burial with the undertaker. In the presence of Ferrari the burial certificate was made out. Clementina gave the necessary information and her body was interred under the name of "Celestine Franchi" in the "Franchi" family plot.
Ten days after her death and in the presence of Ferrari the matter of her estate was discussed by the family, and the appellant was selected as the one to act as the administrator of her estate without objection by Ferrari.
Whatever presumption can be said to have grown out of the testimony given by the witnesses on behalf of Ferrari was rebutted by the testimony and documentary evidence introduced by appellants. Consideration of each portion of the proofs and exhibits in the case examined cautiously under the influence of the inference and presumption which the law favors in behalf of morality and decency, leads me to the conclusion that the relationship between Celestine and John was meretricious.
Moreover, Ferrari was legally incapable of contracting a marriage (common law or ceremonial) in 1903 or 1904 since his wife, Ida, was still living, and it is conceded in the case that no divorce had been granted.
The circumstances of the common law marriage which he says he contracted are further described by him as follows: "Q. Was anybody else present when she [Celestine] said, `I *Page 461 
want you to be my husband?' A. No, only me and her. Q. When she said, `I want you to be my husband,' what did you say? A. I said, what time will you be married? I can't marry you. I willlive with you as husband and wife. Q. You knew at the time she asked you to become her husband that you could not become her husband A. Yes. That is what I told her about. Q. She knew that you were married at that time? A. Yes; she know." (Italics mine.)
On re-direct examination by his counsel Ferrari said: "A.
Well, a Catholic can't be married because I have another wife before. I don't want to marry all the time, because we was afraid we would have trouble with the other wife. Q. What kind of a marriage do you mean? A. Marrying and living together as man and wife? Q. Yes, but what kind of marriage do you mean when you now talk about marrying? A. I can't go to the church.Q. Why not? A. Because I would be afraid of the first wife." (Italics mine.)
This testimony establishes that both knew of the existing impediment to a valid marriage. The cohabitation known to the parties in its inception to be illicit, in the absence of proof to the contrary, will be presumed to have continued as such throughout the period of cohabitation. True, this presumption is not conclusive. It may be rebutted and proved to have become matrimonial after the death of the first wife, and a lawful common law marriage between the parties established. Collins v.Voorhees, 47 N.J. Eq. 555; Chamberlain v. Chamberlain, 68 N.J. Eq. 414.
This may be done by proof of circumstances excluding the presumption that the original relation continued and by satisfactory proof that it was changed to matrimonial union by mutual consent. Bey v. Bey, 83 N.J. Eq. 239; Schaffer v.Krestovnikow, 89 N.J. Eq. 549. In the instant case there was no change from the illicit relation to that of the matrimonial. After the death of the first wife in 1919, there is abundant evidence to show that the original relation continued up to the time decedent departed this life.
The order of the surrogate revoking the letters of administration is reversed. *Page 462