GRACE HAMILL BEY

*v.*

JOHN BEY.

[Submitted December 15th, 1913. Decided May 15th, 1914.]

1. Where complainant in a suit for separate maintenance claimed that a common law marriage agreement was entered into between her and defendant upon a certain date, she cannot rely upon any other agreement, and proof of subsequent cohabitation with defendant and reputation of marriage is only evidence that the agreement claimed was made.

2. In determining the sufficiency of the proof to establish a marriage *per verba de præsenti*, regard must be had to the intent of the parties. the time which has elapsed since the assumption of the relation, and the manner in which the parties had cohabited in the meantime.

3. In a suit for separate maintenance, evidence *held* sufficient to show a common law marriage *per verba de præsenti*.

4. .Where the words claimed to amount to a contract of marriage *per verba de præsenti* are ambiguous, the intent of the parties may be examined into, as in cases of other contracts, and, if the subsequent conduct clearly indicates that they intended matrimony, they are legally husband and wife.

5. Where a man and woman have cohabited ostensibly as husband and wife. and are treated by their friends and relations as such, the law will presume that they have been legally married.

6. The presumption of marriage arising from cohabitation and repute is rebuttable, and, where it is shown that the cohabitation began meretriciously, or at a time when one party could not marry, the burden is upon the person claiming the marriage to show it independent of the presumption.

7. Where the parties had had secret intercourse without cohabitation, but thereafter began to cohabit openly as husband and wife, and such cohabitation continued unbroken for a number of years, the change in

the manner of living, especially when accompanied by a marriage agree-
ment, overcomes the presumption that the original meretricious relations
continued.

8. In an action for separate maintenance, where complainant relied
upon a common law marriage, evidence *held* not to show that complain-
ant had not been faithful to the defendant during the time they had co-
habited as husband and wife, and therefore not to rebut the presumption
of marriage arising from cohabitation.

*Mr. Charles M. Mason* and *Mr. Clyde D. Souter,* for the com-
plainant.

*Messrs. Osborn & Astley,* for the defendant.

GRIFFIN, V. C.

The complainant in this cause, claiming to be the wife of the
defendant, by virtue of a non-ceremonious or common law mar-
riage, entered into June 22d, 1904, filed her bill for main-
tenance. The defendant denies the existence of the marriage.
No claim is made that the parties were united by a ceremonious
marriage. The parties lived together until April 3d, 1912; dur-
ing the intervening period they held themselves out as husband
and wife, and were so known among their relatives and friends
and the public generally.

The complainant and defendant were acquainted from child-
hood. When the complainant was about thirteen or fourteen
years of age her mother died, and, pursuant to her dying re-
quest, the child was placed in the Convent of the Good Shep-
herd in the city of Newark. At the time of the mother's death
there were five children, namely, Grace, the complainant, Harry
Hamill, Frances Hamill, Mrs. Englant, and another sister who
subsequently died. When the complainant was not quite eigh-
teen years of age she left the convent and lived with her brother
in Newark, and then with her sister in New York, for a period
of about four or five months, and then lived with her sister
Frances in a furnished room at 3 Orange Place, in the city of
Newark. She says that about six months after she left the con-
vent, about February, 1904, she met the defendant upon the
street in the city of Newark and he kept company with her,

and, about the latter end of April or the forepart of May, 1904, he asked her to marry him, that she would not then consent, because he wanted to be married by a minister, that they became engaged; he admits that she promised to marry him, but does not say when the promise was made. The complainant in her direct examination, admitted that she had sexual intercourse with the defendant. She was then examined by her counsel, as follows:

"*Q*. Now on June 22d, 1904, what conversation did you have in regard to marriage?

"*A*. Well, he asked me to be his wife, and I consented.

"*Q*. And what did he say to you, do you recall?

"*A*. No, only that he asked me to be his wife.

"*Q*. Where were you to be married?

"*A*. Why, when I asked him where we were to be married I wanted a priest.

"*Q*. What did he say to that?

"*A*. He had no use for a priest.

"*Q*. Well, what did you say?

"*A*. He said we would live without a ceremony.

"*Q*. What did you do, Mrs. Bey, after this conversation?

"*A*. Why, I agreed to be his wife.

"*Q*. And what did he do?

"*A*. My sister was living there with me, and he said, 'Come, we will tell Frances you are my wife and we are married.'

"*Q*. And where did you go to tell your sister?

"*A*. My sister was there in the house.

"*Q*. Where?

"*A*. Just in the next room.

"*Q*. Well, where is that located?

"*A*. 3 Orange Place.

"*Q*. What did he tell her?

"*A*. That we were married and he had come to live there.

"*Q*. And did he live there?

"*A*. Yes, he lived there about three months."

On cross-examination she testifies as follows:

"*Q*. So the first thing he did when he met you was to ask you to marry him?

"*A*. Yes.

"*Q*. You did not consent then, did you?

"*A*. No, I did not consent to marry him because he wanted to be married by a minister, and I didn't believe in a minister.

"*Q*. Yes, and you would not consent, and before you finally did consent you had intimate relations with him?

"*A*. Well. I knew something had to be done. I was engaged to him, and I asked him if we wouldn't get married."

Frances Hamill, the sister, after testifying that the defendant had kept company with her sister, the complainant, and called at their house quite some time, was examined as follows:

"*Q.* Did John Bey ever come there in June, 1904?

"*A.* Yes, sir; he called there.

"*Q.* Do you remember what time in June?

"*A.* It was around June 22d.

"*Q.* Did you see him when he came?

"*A.* Yes, sir.

"*Q.* Did you have any conversation with him?

"*A.* He came to me and told me that Grace had consented to be his wife, and that they were going to be married, and he was coming there to live, which he did.

"*Q.* When was that?

"*A.* That was June, 1904.

"*Q.* And when did he come there to live?

"*A.* He came about the next day.

"*Q.* And how long did he live there?

"*A.* He lived there for three months, and I left; I had to go to New York to take care of three children of a sick sister who was in the hospital."

On cross-examination Frances testifies as follows:

"*Q.* Now, will you go back to 3 Orange Place; you say it was in June, 1904, that John told you he was going to marry your sister?

"*A.* Yes, sir.

"*Q.* You were away in what months of that year?

"*A.* I was at business. I knew that he was keeping company with her, and I knew they were to be married.

"*Q.* But in June—the latter part of June—we will say the 22d of June—John Bey had told you that he was going to marry your sister?

"*A.* He said they were married. He came to me and told me that.

"*Q.* And immediately they took the room next door to you?

"*A.* They took a room on the same floor; yes, sir.

"*Q.* Now, when did they take that room—did they take that room before he told you that they were married?

"*A.* No, sir; after."

Harry Hamill, the brother of the complainant, testified that he called to see his sister about July or August, 1905, while they were living together at 128 Court street in the city of Newark. His sister introduced him to the defendant as her husband. He then testified as follows:

"*Q.* Did you say anything?

"*A.* I spoke to Mr. Bey; glad that I met him, and my sister introduced me to him as her husband.

"*Q.* Yes?

"*A.* I asked him, after a little while, I asked Mr. Bey in a natural way, what kind of a wife Grace made.

"*Q.* Yes, and did he say anything?

"*A.* He said, 'All right.' Later I asked my sister where she was married, how she was married. Mr. Bey was present and butted in, saying, 'Grace and I have agreed to marry and live together.' I inquired later about if that was all right, and it was; I was informed of that later by various people, that it was just as good. He told me that he did not believe in a priest or minister."

The testimony of both parties leaves in doubt the number of times they had sexual intercourse prior to June 22d, 1904. Taking the time that elapsed between the first intercourse at the Buffalo Hotel and the second, at 3 Orange Place, which according to the estimate of the defendant was seven or eight weeks, would bring the date of the second intercourse about June 22d, 1904, from which it might be inferred that the second intercourse was had after the alleged marriage. The fact might have been readily explained by the complainant, but she offered no testimony on the subject. That they had intercourse once is admitted, with the possibility of the number being increased to three or five times before June 22d, 1904. This intercourse was had after promise of marriage and was secret.

On the 22d of June, 1904, there was a complete change in their relations; they assumed open and public relationship as husband and wife before the world, at 3 Orange Place. A room adjoining that theretofore occupied by the complainant and Frances was taken. They lived together at this place for about three months (during two of which the sister Frances lived with them); at 100 Mulford avenue for two months; and at New street with friends of the defendant, for about four months. During these nine months they boarded. They then quit boarding and took up housekeeping at 138 Court street, where they lived together for two and a half to three years. While at the latter place, Mrs. Englant (her sister) and her husband stopped with them for three months, and afterwards resided in the same house in separate apartments for about one year. At the same

address Harry Hamill and his family resided for quite a period. From there they moved to 203 Mulberry street, where they lived one and a half years. Again while living on Mulberry street, Mrs. Englant came to live with the complainant and defendant, and remained with them about six months. It was while at this place that the photo (*Exhibit C-6*) of the complainant and defendant and Mrs. Englant and her child was taken on the roof. From there they moved to 103, A, Quitman street, where they resided for a year and a month. The father of the defendant, Peter Bey, then sold the saloon business at 477 Washington street to the son, and the parties lived over the saloon for two years and nine months, until the defendant left her, on April 3d, 1912. The total of the period which complainant says they lived together in the various places exceeds the time elapsed between June 22d, 1904, and February, 1912, but it is undisputed that they lived in the places stated for substantially the periods given.

The complainant says she was introduced to "Aunt Minn," the sister of the defendant's father, in Washington street, by the defendant, as his wife, about two years after the marriage. She said that her husband's father wanted her to go down and stay in the place for a few days while he was away on a vacation, and she went down, and at that time she met Aunt Minn.

During the course of the trial a great many bills, contracts and postal cards were offered in evidence, made out against, entered into by or addressed to "Mrs. John Bey," or "Mrs. Grace Bey." Two of the postal cards were sent by the defendant to the complainant. The first of these papers offered in evidence was a gas bill for 203 Mulberry street, made out against "Mrs. John Bey." There was also an agreement made the 5th day of May, 1907, between Hahne & Company and "Mrs. John Bey" for the purchase of beds, bedding and household furniture on the installment plan, the price being $204.15. Also a pass book in Hahne & Company showing the receipt of money order under the above contract, the last payment being $25, the total payments amounting to $157. Also a certificate of membership in the household club of Hahne & Company, which enabled Mrs Bey to purchase furniture, carpets, &c., to the extent

of $100, under the plan of club membership. These contracts were made while they were living at Mulberry street. There was also offered in evidence a picture of the complainant and the defendant and the complainant's married sister and her child, which was taken on the roof of the house at Mulberry street about 1906 or 1907. There was also offered in evidence another picture of the defendant and Harry Hamill, taken together; a postal card addressed by a friend of both parties to "Mrs. John Bey, care of Victoria Apartment House, Mulberry street near Fair street, Newark, N. J.," postmarked "March 29th 1908;" a postal card dated September 11th, 1907, addressed to "Mrs. Bey, 203 Mulberry street, Newark, N. J.," from a lady friend; a postal card from the defendant to the complainant, addressed "Mrs. Grace Bey, 136-a Quitman street, Newark, N. J.," with the words, "Just fishing, that's all," and no signature. This postal card was dated July, but the year is indistinct. I take it to be either 1908 or 1909, because they then lived at Quitman street; a postal written by defendant to complainant from Easton, Pa., where he went on an outing with the Third Ward Guards, addressed "Mrs. Grace Bey, 477 Washington street, Newark, N. J." There was also offered a postal card written by the complainant's sister Frances to "Mrs. John Bey, 136-a Quitman street, Newark, N. J.;" two postals, both mailed December 22d, 1910, written by "Aunt Minn," the one addressed "Mrs. John Bey, 477 Washington street, City," upon which was written "Best wishes from Aunt Minn," the other addressed "Mrs. John Bey, 477 Washington street, City," upon which was written "Best wishes from Aunt Minn;" a postal card written by Aunt Minn to "Mr. John Bey, 477 Washington street, City," upon which was written the following: "Best wishes for a Happy New Year, from Aunt Minn. Love to Grace—Eula and Aunt Minn." (Eula is a cousin of the defendant.) This card is postmarked "Newark, December 30th, 1911."

One Philip McGovern addressed a letter to the defendant as "Friend John," in which he says,

"I am sending by bearer a waist I promised your wife one night I was down to your place. I also enclose a picture of our model who poses for

our advertisements. Do you think the picture somewhat resembles your wife? I think Tom D. promised her one too. Tell her to get after Tom. Trusting both of you will like the waist, I am, sincerely your friend, Phil McGovern."

Annexed to this letter is the picture referred to in the letter, which was offered in evidence as part of the letter. This letter was written about 1910. There was also a bill rendered by L. S. Plaut & Company on March 28th, 1910, to "Mrs. J. Bey, 477 Washington street, City," in which the receipt was acknowledged of her order for five awnings, $24.30.

All of the foregoing bills, contracts, postals and letters were seen by the defendant. Some of them were received by him and delivered to his wife. The awnings last referred to were purchased for 477 Washington street, and the defendant advised with the complainant as to what color she liked, and the defendant sent a check in payment of the bill.

There is also evidence that Peter Bey recognized the complainant as his son's wife. On redirect examination she testified as follows:

"Q. Was anything said in the presence of his father that you were his wife?

"A. Yes, there was a party that I was visiting his house one night and he told some gentleman there to wait, that he would send him home in his car; he said, 'Wait, Johnnie's wife is here and she is going down.'"

When the father transferred the store, 477 Washington street, to the defendant, they had some "jubilee," as they termed it, or opening entertainment, at which his relatives, his uncle and cousins from Brooklyn, "Aunt Minn," "Uncle Joe," and his father and stepmother were present, and the defendant introduced the complainant to them as his wife. That there was such an affair with Peter Bey present appears also by the testimony of George Dougherty, who appeared to be friendly to the defendant. Although the father testified more than a week after the above testimony was given, he did not deny it, but contented himself with the statement that he knew her from childhood and knew that she was living with his son, neither ever told him they were married, they never visited his house together,

he never addressed her as "Mrs. Bey," always addressed her as "Grace," never introduced her as "Mrs. Bey," or as his daughter-in-law.

If the statement of the complainant that at this "jubilee" she was introduced to all of the defendant's relatives as his wife was untrue, why were not Mrs. Peter Bey, "Aunt Minn," "Uncle Joe" and the other relatives called to deny her story? The failure of the defendant to produce these witnesses leads strongly to the conclusion that if produced they would support the statement of the complainant and perhaps make disclosures on other branches of the case extremely injurious to the defendant's contentions.

Their production and denial of the story of the complainant would probably tend to weaken belief in all the testimony of the complainant. If they appeared to be of a type different from the witnesses who testified against the complainant theirs would be the only testimony offered by the defendant against the truthfulness and morality of the complainant worthy of belief.

The evidence is therefore overwhelming, that from the time they came together at Orange Place in June, 1904, until he left her on April 3d, 1912, they constantly lived together ostensibly as husband and wife, claiming to be such, and so demeaning themselves toward each other and were received in society and treated by their friends and relatives as husband and wife. She performed the functions of a wife about the household and also looked after his welfare in his business, discharging the cook and acting as such until another was employed; went in search of him to bring him home when on sprees; she had access to the money in the store and was permitted to take what she desired; her sole source of income was from him; their mode of life could not excite in the mind of anyone the suspicion that they were not husband and wife in fact. Shortly after the defendant left her, and while he was at Hot Springs, she heard something about a Smith girl, which led her to go down to see Miss Smith; he returned from Hot Springs on Sunday and went to see the Smith girl that night; the complainant followed; when he came out she says she said a lot (doesn't remember all she said);

she asked him what he was doing there in this girl's house, that
he was a married man; then he cursed her and said he would
kill her or break her face or something.  Frances, her sister,
says she was with the complainant when they caught the de-
fendant coming out of the house of Hazel Smith; her sister
asked him what he was doing in that house, being a married
man, and that he said, "Nothing, nothing."  He got scared and
she told him to keep away from there, that she was his wife.
He says, "I will never go there again;" she says she caught
him in the same place another night about two weeks after.
Complainant went to the city clerk's office in Newark after the
commencement of this suit to make inquiry as to whether or
not he had obtained a license to marry the Smith girl, because
he had told her he had such license; the defendant afterwards
attempted to procure a license in Newark to marry the sister
of his stepmother (Mrs. Peter Bey) and failing, because of
the protest, the defendant, with his father, went to New York
City and procured such license, and the defendant and Sarah
Allison, the sister of Mrs. Peter Bey, were thereupon married
in New York City by a minister of the gospel.  Before their
marriage, however, the complainant duly warned Miss Allison
that she was his wife, and that she should keep away from him.
The defendant does not deny the occurrence in front of the
house of Miss Smith testified to by the complainant and Frances,
but admits that he recalls the occurrence.

The complainant therefore not only acted toward the de-
fendant during the eight years as a lawful wife, but persisted,
after he endeavored to throw off the yoke, in declaring that she
was his wife.

There are certain sidelights in the defendant's testimony that
tend to prove the truth of the complainant's testimony as to
what transpired on June 22d, 1904.  The complainant says she
was engaged to be married to him before there had been any
sexual intercourse.  This the defendant does not deny; on the
contrary, he says she promised to marry him, without fixing any
time, but kept putting off the marriage because he could not
support her as she wanted to be supported.  He says he met her
at Minnie Halsey's saloon on Greene street about the latter end

of April or the forepart of May, and they went to the Buffalo Hotel where they occupied the same room all night. As the defendant does not directly deny that the proposal of marriage was made before this occurrence, but contents himself with saying the first time he asked her to marry him was in June, I must assume that the engagement had been entered into prior thereto. He says he next saw her two or three weeks afterward at the Buffalo Hotel; that he was playing the piano; that she spoke to him and invited him to her house in Orange street; that he went to her house a couple of nights afterwards and nobody was home; that he saw her a week or two afterwards; that she came into the place (the Buffalo Hotel); that nothing happened that night; that he saw her two or three weeks afterwards at the same place, and she asked him to come and see her, and she invited him up to her house, and he stayed there all night. It will be noted that the periods given by the defendant above mentioned of three weeks, two weeks and three weeks, would make eight weeks after about May 1st, which would bring the time when he first stayed all night at the Orange Place house as about the 25th of June. He does not claim that he had intercourse with the complainant other than the one time at the Buffalo Hotel the latter end of April or the forepart of May, until the date when he says he stopped over night with the complainant at her home in Orange Place.

On direct examination he testified as follows:

"*Q.* How long did that period at Orange Place last; how long did you go up there?
"*A.* Why, I cannot say for sure; it might be a couple of months.
"*Q.* During that period did you ask Grace to marry you?
"*A.* I did; yes, sir.
"*Q.* When did you first ask Grace to marry you?
"*A.* In June, some time, it was.
"*Q.* What did she say?
"*A.* She said no, I could not support her."

The defendant does not attempt to explain what occurred or what conversation or understanding was had between them which caused him to take up his home at Orange Place with the complainant the latter end of June, 1904, nor what explana-

tion was made to Frances touching their changed relations, but with one accord, without any prior conversation or understanding and no explanation to Frances, the parties commenced cohabitation, and an adjoining room was taken for Frances.

In the absence of any such explanation, it is plainly apparent that when he says he asked her to marry him in June this was the time that the complainant speaks of when he asked her to marry him and she consented to become his wife, and in pursuance of this agreement to be husband and wife, so understood by the parties and as explained by Frances, he took up his residence at Orange Place. The defendant says that she lived with him as his mistress. He says that during the time they were living together he repeatedly asked her to marry him, and she refused because he could not support her. He would lead the court to believe that this young woman, cleanly in appearance, without any of the *indicia* of viciousness, would prefer to lead a life of prostitution rather than be a lawful wife, and that she was deliberately of this mind for a period of eight years—for he says that when they were at Washington street, just prior to his leaving her—he again asked her to be his wife, and she refused on the ground that he could not support her properly; and then he left her because she would not marry him, and he desired, apparently, to change his mode of living. This statement seems to be absurd. There is nothing in the testimony that shows in the slightest degree that she was dissatisfied with his income or their mode of living; on the contrary, his circumstances had continuously improved, and from a small stipend at Orange Place his income had, in the eyes of this young woman, reared as she was, grown to be a large sum; she had the handling of his funds that came into the store, and knew what he was making.

The complainant denies emphatically that he ever asked her to marry him after June 22d, 1904. The father of the defendant says he wanted John to marry the complainant and told him to marry her; that he knew that John had asked her to marry him, and he knew that he had lived with her for six years; but after John had left her she told him that she was not ready to marry Johnnie; that he had urged John to marry

her. He said, "I told him" (the defendant) "I was offered twenty-five hundred dollars for the place." I said,

"Here, John, is a chance for you to go ahead and make some money, and I advise you to get married and settle down. You have been going around for years now and depending on me, and it is pretty near time that you settled down and made some money for yourself."

He does not say, however, (although pretending to know the relations existing between the complainant and the defendant), and knowing the complainant from childhood, that he ever urged the complainant to marry his son. And yet, if the man had any respect for decency and morality, if he had the natural desire of a parent to have his son lead a moral, upright life, he would have used his influence with her to change her life of shame to one of honorable matrimony in the sight of God and man, and his story not only lacks any semblance of morality or truthfulness but seems also to be somewhat in conflict with the statement made by the defendant to the complainant, as testified to by the complainant, where she says that after he returned from the Hot Springs he went to live with his father in Clinton avenue and she saw him while he was there, and, she says, when asked to tell about the interview:

"A. Why he came back to me one night and said he intended to go back to the saloon; that he was afraid if he came back to me and his father knew it he would disown him."

This conversation is not denied by the defendant.

Another sidelight on the case considering the testimony of the defendant that he had asked her repeatedly during the eight years they lived together to be his wife, is his attempt (which utterly failed) to show that during the period they lived together she was intimate with other men, and after he left her, she visited a house of prostitution about twice a week with some unknown man. The first story he tells to support his attempt is that of an alleged wrong-doing while they were living at Orange Place. After they had been living together about two weeks at Orange Place (and he places it about the latter end of June) he testifies as follows:

"*Q.* Now, at the end of that time do you remember seeing George Wallace there?

"*A.* It was—let me see—I believe it was in June that I saw Wallace there.

"*Q.* Well, just state what happened.

"The Vice-Chancellor—What year was that? .

"The Witness—1904.

"*Q.* In the early part of what part of July, the early or the late part, or what?

"*A.* It was late in June.

"*Q.* Now, just state what happened; what time did you get there?

"*A.* Why, I had been there for a couple of hours. It was around eleven o'clock, I guess, when I went in.

"*Q.* Who did you see first when you went in there?

"*A.* Why, I saw Grace and her sister and Cook, the woman who ran the place, Mrs. Cook.

"*Q.* Did you see Wallace when you first went in?

"*A.* No.

"*Q.* Did you have any relations with Grace that night?

"*A.* Well, I went to bed with her.

"*Q.* Well, about what time, do you remember?

"*A.* I couldn't say; we were in there drinking and stayed up quite late.

"*Q.* What happened that night?

"*A.* I went to bed with Grace and went to sleep and I woke up in the morning and Grace was not in bed, and I went out and called, and nobody answered, and I looked around and it happened that the next door to me was open, and I looked in and she was in bed with George Wallace.

"*Q.* Did you say anything?

"*A.* No.

"*Q.* What did you do then?

"*A.* Walked out."

George Wallace, a saloon-keeper, a witness called on the part of the defendant, after saying that he knew the complainant and the defendant, that the complainant lived at 2 Orange Place with her sister, that the complainant and defendant were there, and that he, the witness, visited there, testified that on this particular night last referred to by the defendant they sat around and enjoyed themselves—that is, the complainant, the lady of the house, himself and one or two other parties; that the defendant was not there at that time, but came in later on. He was asked:

"*Q.* When did he come in?

"*A.* While I was in bed.

"*Q.* That is, he came in after you had gone to bed?

"*A.* Yes, sir.

"*Q.* Did you see him?

"*A.* Yes, sir; I did.

"*Q.* Now, after you went to bed, tell us, if anything happened?

"*A.* Why I went to bed with Grace.

"*Q.* And that was after John got in?

"*A.* No, before John got in.

"*Q.* What became of Grace then?

"*A.* Grace stayed with me in bed.

"*Q.* All night?

"*A.* Yes, sir.

"*Q.* Did John come in there?

"*A.* He came in the room.

"*Q.* When.

"*A.* Why, I should judge, about an hour or an hour and a half afterwards. The door was open.

"*Q.* Was there any fracas or row?

"*A.* Well, he didn't say anything, but he didn't like it; went downstairs, I guess; went out; I don't know."

He then says he was never intimate with the complainant on any other occasion. This testimony is plainly false.

The defendant says that he went to bed with the complainant, and when he woke up in the morning he looked around, the complainant was missing, and he found her in the adjoining room with Wallace. Wallace testifies that when he went there that night the defendant was not there, that he went to bed with the complainant and after he had been one or two hours in bed with her the defendant came in, and, seeing the situation, turned on his heel and walked out. It is impossible to believe that Wallace and the defendant would differ on such an important point, for if Wallace's story be taken as true, then the defendant did not retire with the complainant that night, whereas, if the defendant's story is taken to be true, Wallace must have come into the house long after the parties had retired. which produces an irreconcilable conflict between them. The story is not only false, but unnatural. Here the defendant was engaged to this young woman, yet, according to his testimony, he walked into the room and saw her in bed with another man, and was not moved to anger, and further, when it is considered that, with knowledge of this fact, he says he persistently asked her to marry him for eight years afterwards, it simply brands his story and the story of Wallace as a pure fabrication, invented

to destroy her character. The stories of Wallace and the defendant are so unnatural and absurd that their mere statements of the occurrence without comment carries with them ample proof of their falsity. This story is absolutely denied by the complainant.

Another attempt was made to show that she was of immoral tendency by the witness Michael Siler, who was the day bartender at the defendant's saloon, and who says that upon one occasion he came in about twenty minutes past six in the morning, and he was asked in the back room, and he went there. He then testified as follows:

"*Q.* Who asked you in the back room?
"*A.* A man that was sitting with Mrs. Bey in the back room.
"*Q.* Who was the man?
"*A.* I can't remember who the man was."

He testified that they were drinking, and they were sitting in chairs at a table, each in a separate chair. He further testifies:

"*Q.* Did she say anything to you on that occasion?
"*A.* She asked me to come in; that she wanted to introduce me to her old sweetheart."

He says he cannot remember anything else. He also testified that her chair was a foot or two from the man's, and that she went upstairs about seven o'clock in the morning. The complainant was asked about this on her cross-examination and she denies that she said to Michael Siler, "Let me introduce you to my sweetheart." The above matter was opened up by the cross-examination of the complainant by defendant's counsel, and she said the man referred to by Michael was a man named Burns whom she met after she came out of the convent; that he came into the saloon with a lady who stayed with Mr. Burns until about six in the morning; that she cashed a check for Mr. Burns; that she remained there until about seven o'clock in the morning waiting for the cook to come in because she had orders to give her. She says that Mr. Bey was not upstairs asleep. It seems that he had been out, and she says he did not return

unless he went up the front way. She says that when she went up at seven in the morning she found Mr. Bey upstairs, but that she had gone upstairs two or three times before.

Thomas Lynn said that about ten days before he testified he had a conversation with the complainant, and about this conversation, testified as follows:

"*Q.* What did she say?
"*A.* Why, nothing in particular. We had a general conversation, and she said she did not care to get anything excepting satisfaction for the time she had been with him."

She denies this.

Another witness was J. Broadhead Woolsey. He testified to the occupancy of the Quitman street apartments by the complainant, but is vague and indefinite in his story. He testified as follows:

"*Q.* Do you remember ever renting any apartment to this lady here, the complainant?
"*A.* Well, I am not very positive about that, but I presume I must have rented it to some one there; I don't exactly remember this lady at all.
"*Q.* Do you remember seeing this complainant who sits here?
"*A.* I think so.
"*Q.* Did she introduce anybody to you at any time?
"*A.* Well, I don't say positively that she introduced anybody, but there was a party living there that I supposed to be Mr. Bey.
"*Q.* Was it John Bey here, who was just on the witness stand?
"*A.* No, it is not that man; I never met him."

The testimony of the defendant, which is as follows, may explain who this man was:

"*Q.* Were there lodgers or boarders in this place up there in Court street?
"*A.* Why, my friend Tommy Lynn was there; I brought him up there.
"*Q.* Did he pay his board?
"*A.* I believe he did; I don't know.
"*Q.* Did he pay you the money?
"*A.* Not me; no, sir.
"*Q.* Was there a boarder in Quitman street?
"*A.* Yes, sir; Tommy Lynn might have been there for a week or so."

Thomas Lynn, above referred to, was sworn as a witness on the part of the defendant, and on cross-examination testified as follows:

"*Q.* How did he introduce you?

"*A.* Well, I will tell you, there was no introduction in fact; I was incapacitated financially, and he said, 'You can come and sleep with me;' I said, 'All right,' and I went up that night and I did not see her that night, and in the morning I heard him calling her 'Grace' and I called her 'Grace.'

"*Q.* He told you you could come up and sleep at his house?

"*A.* Well, he said I could come up there and sleep; yes."

The complainant also testified that while at Quitman street Johnny Hillocks boarded with her, but says that Johnny was a boy; that she took him in her house and fed and clothed him and when he got a position he worked for two or three weeks and left one night. The money that supported this boy was her husband's money.

Louis Frances, a witness for the defendant, merely testified that he took a verbal message from the complainant to Frances Hamill at the Hotel Navarre.

Andrew Schreiber, who was employed as a room keeper or in some other capacity in an assignation house at 360 Halsey street, Newark, testified that he was employed in what he called a "rooming house" kept by a woman named Lily Cohen; that he worked for her about sixteen years, eight years in Halsey street, and eight years in Mulberry street. He says that he never kept any records; that in the year prior to June, 1914, for a period of about six months, the complainant came to the place, generally about Tuesdays and Thursdays of every week, may be one week on Tuesday and the next week on Thursday. He said that it was more than twice that she came, but he could not tell that it was more than ten times; that she always came with the same man. He then testified as follows:

"*Q.* What did they do there; what happened there?

"*A.* Now, I don't know any more than that they went into a room.

"*Q.* Did you have charge of those rooms?

"*A.* I collected the money."

And he says he collected the money from the man. On cross-examination he admitted that he tended bar for Peter Bey one night. He says that he came to testify voluntarily, without a subpœna, at the request of Peter Bey and a friend of his who came with him, a Mr. Goldsmith; and that he worked for Goldsmith. He says that probably eight or ten couples came to the house in one night. On recross-examination he says the nights might have been Monday, they might have been Saturday, but not Sunday, because they did not keep open on Sunday. He was then asked:

"*Q.* Who was the man?
"*A.* I didn't know him.
"*Q.* Don't you know his name?
"*A.* No, sir.
"*Q.* Would you recognize him if you saw him in this room?
"*A.* No.
"*Q.* Still, you can recognize this girl? Well, how is it that you say you can recognize the girl and cannot recognize the man?
"*A.* Why, I don't see the man in this place.
"*Q.* Well, if he was here could you recognize him?
"*A.* Well, if he was here I could; yes, sir."

He then said the man had light hair and was about five feet four or five feet five tall, and was about thirty-five or thirty-eight years of age. He did not notice that he always came with the same woman. Later on he said he did not come in with any other woman.

This witness appeared in court strongly under the influence of liquor, and his appearance and manner of testifying outside of the contradictory stories he told, render his testimony absolutely unworthy of belief. I have not the slightest faith in anything he testified to.

Ray Winters testifies that she had a conversation with the complainant about a year and a half before she testified, which would bring the date to about the first of January, 1912. She testified as follows:

"*Q.* What did she say?
"*A.* Well, she said Johnny had asked her to marry him and she was sorry she had not, and she might have avoided all the trouble."

This witness had been married three times. Her real name is Lindrum; she gave her name on being sworn as Winters. She was examined as follows:

"*Q.* Now, you came to Mrs. Bey and tried to get her to give you employment, didn't you?

"*A.* Yes, I did.

"*Q.* And she would not give you employment, would she? ·

"*A.* She said she would ask Johnny.

"*Q.* And you knew that she told Johnny that she would not have you there because you were mixed up in a case where a man was murdered?

"*A.* I was cook there at that time."

When asked to state the time that the conversation, in which the complainant said that she was sorry that she did not marry Johnny, took place, she testified as follows:

"*Q.* Well, fix it as near as possible.

"*A.* Because she would come to my house at different times and tell me that her and Johnny had had words again, and I don't know just when it was."

She fixed the time as around spring or summer. These conversations about her and Johnny, as she puts it, were had about 1911. She said in 1911 she used to "come over to my house and say her and Johnny had had trouble again, and she would feel bad about it." ·

"*Q.* Now, was this before Johnny left her?

"*A.* Yes.

"*Q.* She told you before Johnny left her, that Johnny ·had asked her to marry him?

"*A.* She said they might have avoided all the trouble.

"*Q.* Well, was there any trouble at that time?

"*A.* Why, yes, her and Johnny was fighting at that time.

"*Q.* Well, they were just quarreling?

"*A.* Yes, sir.

"*Q.* You heard Johnny testify here that he left her because she would not marry him, didn't you, and she was telling you that she was sorry she had not married him?

"*A.* Yes, she did.

"*Q.* And this was before Johnny left?

"*A.* Yes."

I place little credence in the story of this witness. She says they were quarreling, and the complainant used to come to her

house in 1911 and tell her of her troubles, and it was during this period that she said that Johnny had asked her to marry him, and she was sorry she had not married him. This is hardly in accord with the defendant's story, that, just before leaving her, he asked her to marry him and she would not do it, and it was for that reason that he left.

The complainant, in her rebuttal evidence, denied that she had this conversation with Mrs. Ray Winters or Lindrum, on her direct case. On cross-examination, her attention being called to what Mrs. Winters subsequently testified to, she denied the story as fully as Mrs. Winters testified to it; and on re-direct examination, she testified as follows:

"*Q.* Now, Mrs. Bey, in your cross-examination you testified you knew a Mrs. Winters; who was Mrs. Winters?

"*A.* Why, she was a woman that came in and sat in the back room of our saloon nights. My husband would not allow me to talk to her. He said she was in some murder case, and she was pleading with me to put her to work.

"*Q.* Did you give her a job?

"*A.* No.

"*Q.* How did she feel about it when you would not give her a job?

"*A.* She didn't like it very much, and after my husband left the place his father came in and claimed it, and put this woman to work.

"*Q.* And you had trouble with her while she was working there?

"*A.* Yes, sir; plenty of trouble with her."

Outside of Mr. Woolsey and the father of the defendant, it appears as if the defendant endeavored to make his defence by calling witnesses from the lowest grades of society. I assume that he might have called, if he desired, his Aunt Minn, his cousin Eula, his uncles and other relatives, to support him, but he failed to do so.

The testimony of Peter Bey, the father, is unbelievable. His position is rather desperate. After knowing that his son had lived with the complainant for a period of about eight years, and knowing that she was vigorously asserting that she was his wife, that she had done that which prevented his son from securing a license for his marriage in the city of Newark, he took his son to the city of New York, procured a license, and had him married to his sister-in-law. His utter recklesness

and lack of moral sense lead to the conclusion that, under the circumstances of this case, he would testify to anything necessary to accomplish his purpose.

There was also an effort made throughout the entire case, on cross-examination, by innuendo to prove that the complainant, as well as her sister, were immoral, and, owing to the character of the case, the defendant's counsel was permitted to go to the extreme in such cross-examination, but nothing that was elicited rose to the dignity of proof. On the direct examination of the defendant his counsel examined him as to her statements to him of her relations with other men, and says she admitted to him that she was friendly with two other men, whom she named; but there was nothing in this friendship which indicated that she admitted to him that there were any sexual relations, nor that the friendship was any other than the normal friendship which might exist between parties generally. The complainant swears positively that she never had sexual relations with any other man than the defendant, and, considering that during the eight years that they lived together, apparently with the normal happiness of husband and wife, I cannot discover anything in the case which indicates that her story is not true.

The question to be determined on the foregoing facts is— Did the complainant and defendant, by virtue of an agreement, entered into on the 22d day of June, 1904, become husband and wife?

No claim is made that any such agreement was made thereafter. The complainant, therefore, must stand or fall upon this agreement. *Collins* v. *Voorhees, 47 N. J. Eq. 555; Pearson* v. *Howey, 11 N. J. Law 12; Blackburn* v. *Crawford's Lessee, 3 Wall. 175.*

The subsequent cohabitation, with matrimonial habit and repute, is nothing more than testimony in proof of the marriage. *Collins* v. *Voorhees, supra.*

The validity of the marriage here alleged depends upon the sufficiency of the proof that the agreement was entered into *per verba de præsenti.* And in construing the contract regard must be had to the intent of the parties, the time elapsed since the assumption of the matrimonial relation, during which the

precise words used may have passed from recollection, as well as the manner in which the parties lived together during the period of eight years.

The testimony of the complainant strongly indicates that the agreement constituted a contract of marriage *per verba de præsenti*. The parties were engaged, after which there was illicit intercourse, at least once, and, in the extreme, not more than five times. Whatever the result of this intercourse was the complainant did not explain, but it is fair to assume that she feared the consequences of her wrongful act, for, on cross-examination, she said, "Something had to be done," she then waived all of her religious scruples and consented to live with him under a present agreement, so understood by both, that from thence forward they should be husband and wife; they then repaired to Frances, he saying to the complainant, "Come, we will tell Frances you are my wife and we are married," and he then and there told Frances that they had been married and had come to live there. True, the defendant did not say to the complainant, "I do now take you to be my wife," and she, in reply, say "I do now take you to be my husband."

This brings up the question, can the court, in construing the agreement, look to the intent of the parties? That the intent may be inquired into, where the marriage is contracted in jest, was determined in the case of *McClurg* v. *Terry, 21 N. J. Eq. 225,* where the marriage was declared to be null. In *Chamberlain* v. *Chamberlain, 68 N. J. Eq. 736, 738,* on an appeal from a decree advised by Vice-Chancellor Stevenson, *68 N. J. Eq. 414,* where it appeared that the parties were formally married, innocent of an impediment to marriage by the wife, that afterward a divorce was obtained leaving the wife free to marry, thereupon the defendant, in the presence of witnesses, assured the complainant that she was his legal wife and no further ceremony was necessary and thereby complainant, in reliance upon such representations, cohabited with him for twenty years, the court of errors said: "This evidence was a manifestation of an intent to live together as husband and wife, and with the intention and the actually so living, an actual marriage is established."

In *Swinb. Sp. (Ed. 1686)* he says:

"Albeit that the words of the contract, neither of their own natural signification, neither yet by common use and acceptation conclude matrimony, yet whereas the parties do thereby intend to contract matrimony they are inseparably man and wife, not only before God but also before man, in case their meaning may lawfully appear."

This doctrine is cited with approval in *Schoul. Dom. Rel. (5th ed.)* § *27; 1 Bish. Mar. & D. (Ed. of 1891)* § *320; Dickinson* v. *Brown, 49 Miss. 357, 370; Fryer* v. *Fryer, Rich. Eq. Cases (S. C.) 35.*

In *Van Tuyl* v. *Van Tuyl, 57 Barb. 235,* the court said: "If he understood it as a proposal of marriage, and it was so understood by her, and she accepted the proposal, it was a valid contract of marriage. The law requires an actual meeting of the minds of the parties upon that question, namely, that they shall thenceforth, from the time of the making of the agreement, be husband and wife." In *Starr* v. *Peck, 1 Hill 270,* the court said: "No peculiar form of words is necessary to such contract."

In *Regina* v. *Millis, 10 Cl. & Fen. 534, 8 Eng. Reprint 844, 982,* Lord Campbell said: "To constitute such a marriage (*per verba de præsenti cum copula*) there must first be mutual promises solemnly and sincerely entered into. And then there must be a copula while these promises remain unreleased and in force. Now, the words indicating an intention to marry, used in the course of soliciting chastity, not understood to be serious, however culpable they may be, cannot be construed into a binding contract of marriage; and regard must be had to the circumstances under which the copula takes place. If, however, a woman in surrendering her person, is conscious that she is committing an act of fornication instead of consummating her marriage, the copula cannot be connected with any previous promise that has been made, and the marriage is not thereby constituted. In examining all contracts you must look at the intention of the contracting parties, and there can be no binding contract without the parties intending to enter into it."

In *Peck* v. *Peck, 12 R. I. 485, 34 A. M. Rep. (Ex. Anno.) 702,* Chief-Justice Durfee said: "We are of opinion that a mere executory agreement to marry does not become consummated by

copulation, unless the parties so intend. Though cohabitation following an engagement is evidence of such consent, it is not conclusive but only *prima facie* evidence of it."

There seems to be an irreconcilable conflict among text-book writers and courts as to what is necessary to constitute marriage *per verba de futuro cum copula;* some going so far as to hold that mere copula following a promise of marriage in future constitutes marriage; but these cases seem to follow the canon law as laid down in *Wigmore's Case, 2 Salk. 438, 91 Eng. Reprint 380,* while others hold that cohabitation following the promise is evidence from which the inference may be drawn that the cohabitation is intended in fulfillment of marriage, without showing that the cohabitation is assumed with the understanding that it is in fulfillment of the promise and is to constitute marriage.

The divergent views of text-book writers and courts on this subject will be found in the notes of *Regina* v. *Millis, 17 Eng. Ruling Cases 165,* and *Cheney* v. *Arnold, (15 N. Y. 345) 69 Am. Dec. (Ex. Anno.) 609 at page 615.*

The cases of *Regina* v. *Millis* and *Peck* v. *Peck, supra,* are referred to solely in support of the doctrine that the intent of the parties may be inquired into to determine the question of marriage or no marriage, and not with the view of passing on the propriety of the doctrine enunciated on the subject of the contract of marriage *per verba de futuro cum' copula.*

I therefore conclude that if the contract of present marriage is ambiguous the intent of the parties may be examined into; and if, by their subsequent cohabitation, it is plainly apparent that they meant matrimony, they are husband and wife.

The case in this respect seems not to differ from that of ordinary contracts, and the law will, in the case of an ambiguous contract, give it that interpretation which the parties, by their acts and conduct, place upon it. *Chicago* v. *Sheldon, 9 Wall. 50, 56.*

In the present case it is unnecessary to deal with these conflicting views, because here, on the 22d of June, 1904, the parties, then being engaged to be married, by words which appear rather strongly *in præsenti,* then and there, either by

words in the present tense took each other to be husband and wife, or plainly intended that the agreement then and there entered into constituted marriage, and their cohabitation since that time is very strong evidence of such agreement and intent.

In addition to the proof of the intent as shown by their conduct, this intent is further strengthened by the presumption that where a man and woman constantly live together ostensibly as man and wife, demeaning themselves toward each other as such and are received into society and treated by their friends and relations as having and being entitled to that status, the law will, in favor of morality and decency, presume that they have been legally married. *Wallace's Case, 49 N. J. Eq. 530, 534; Costill v. Hill, 55 N. J. Eq. 479, 484; Collins v. Voorhees, 47 N. J. Eq. 555, 559; Keavey v. Barrett, 62 N. J. Eq. 454.*

This presumption, however, is rebuttable, and is never indulged in contrary to the fact. Thus, where the cohabitation begins meretriciously, or where there is an impediment to the marriage, known to one and not to the other, the law will not, in the absence of evidence to the contrary, presume that the status of the parties has changed, and the burden in such cases is upon the person claiming marriage to establish it by proof independent of the presumption arising from cohabitation and repute. *Collins v. Voorhees, supra; Voorhees v. Voorhees, 46 N. J. Eq. 411, 414; Badger v. Badger, 88 N. Y. 547; Brinkley v. Brinkley, 50 N. Y. 185, 198; Caujolle v. Ferrie, 23 N. Y. 94; Cunninghams v. Cunninghams, 2 Dow. 482; 1 Bish. M. D. & S. § 964.*

That the parties had sexual intercourse before the date of the alleged marriage is conceded. It was had, however, under circumstances that in no manner indicated a pretence before the world of an existing marriage relation. The parties at the time were engaged and contemplated future matrimony; and on June 22d, 1904, an agreement was entered into after which there was a complete change in their relations before the world. Thereafter their intercourse was connubial in its character and continued unbroken and unquestioned for eight years until the defendant deserted. This change in their mode of living at least,

when coupled with the agreement as testified to, overcomes any presumption that might arise against the validity of the marriage by reason of the meretricious beginning of their relations. In any event, the presumption against the marriage is not very strong. because they did not cohabit meretriciously. *1 Bish. Mar., D. & S. § 964; Gall* v. *Gall, 114 N. Y. 110, 117; Badger* v. *Badger, supra; Caujolle* v. *Ferrie, supra; Starr* v. *Peck, 1 Hill 270.*

To overcome the presumption which necessarily obtained from the regular living as husband and wife, the defendant sought to prove that the complainant was so morally depraved that she preferred to hold herself free for carnal commerce with many rather than be the lawful wife of one. To establish this fact the defendant was allowed extreme liberty in cross-examination and offers of proof, but he utterly failed to establish by any evidence worthy of belief that the complainant was other than a devoted wife according to the customs and manners of the society in which the parties moved, the tone of which was not very high.

The purpose of this order of proof was to bring the case within the parallel of *Haley* v. *Goodheart, 58 N. J. Eq. 368,* and the defendant argues that he has done so, but the cases are not in any respect alike. In the *Haley Case,* Lavinia was lewd, and although-but sixteen years of age at the time of the alleged marriage, was at that time regarded by her parents as morally vicious. Throughout the entire period from the date of the alleged marriage to the death of Jerry Haley in 1873 there was no connubial cohabitation—no holding themselves out to the world as husband and wife. During the illness of Jerry, which covered a period of years and terminated in his death, there was no communication between them. When Jerry died she did not attend the funeral, but viewed it from a street corner. There was a child born in 1867 which she said was Jerry's. After the death of Jerry, although in want, and Jerry died leaving a considerable estate, she made no claim for support, nor did she do anything to establish the legitimacy of her child, but, on the contrary, went to West Farms and became the housekeeper of one Schofield, where she remained several years under the name of Schofield,

during which period she had a child by some one other than Schofield. The first claim she put forward was in 1891, when her son was about twenty-four years old, when she went to the house of Mrs. Haley and said her son was Mrs. Haley's grandson. The first step to vindicate her claim was in 1895, when proceedings were taken in the orphans court. The case is filled with incidents showing that from the year 1866, when she was sixteen years of age, down to at least 1887 she led a libidinous life.

In *Clark* v. *Clark, 52 N. J. Eq. 650*, there was no evidence of matrimonial habit and repute. The defendant endeavored to show that the complainant was lewd and that their relations were meretricious and not matrimonial. The defendant, however, when asked by a third person, admitted that complainant was his wife. Vice-Chancellor Van Fleet believed the complainant and declared for the marriage.

The court has no right to infer that, because a young woman on the solicitation of the man to whom she is engaged, surrenders her chastity, she is unwilling to change her illicit relations to honorable matrimony; on the other hand, the presumptions are all the other way.

On all of the facts in this case I am satisfied that the complainant has conclusively proven that the complainant and defendant became husband and wife on the 22d day of June, 1904. The complainant, therefore, is entitled to an allowance for maintenance and counsel fees.

I will hear counsel at the chancery chambers, Jersey City, on Monday, May 25th, 1914, at ten o'clock in the morning as to the amount of the allowances.