33 N.J. Super. 504 (1955)
111 A.2d 88
JOSEPH DACUNZO, PLAINTIFF-RESPONDENT,
v.
ELEANOR EDGYE, FALSELY CALLED ELEANOR DACUNZO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 1954.
Decided January 14, 1955.
*506 Before Judges GOLDMANN, FREUND and SCHETTINO.
Mr. Irving Siegler argued the cause for appellant (Messrs. Siegler & Siegler, attorneys; Mr. Harvey Schwartzberg, on the brief).
Mr. Leonard Estrin argued the cause for respondent (Mr. Frederick W. Athay, attorney; Mr. Estrin on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff sued for annulment on the ground that at the time of his ceremonial marriage to defendant she was married to another man who was then living and undivorced from her. Defendant counterclaimed for separate maintenance for herself and the two children of the marriage. Defendant appeals from a judgment granting annulment and dismissing her counterclaim.
The parties were ceremonially married in New Jersey on June 24, 1945 and have resided here ever since. They cohabited and held themselves out as man and wife from the date of the marriage until February 10, 1952, when they separated. The two children of the marriage have been in the defendant's custody ever since.
Defendant had in 1935 married one Byrne, by whom she had three children. Byrne eventually sued her for divorce on the ground of adultery and secured a decree nisi on April 25, 1945, the final decree being entered on July 26, 1945. Thus, plaintiff and defendant married after the decree nisi, *507 but one month and two days before the entry of the final decree dissolving defendant's prior marriage to Byrne.
The parties first met in the spring of 1944, at which time defendant was known as and went by the name of Eleanor Edgye. She was so introduced to plaintiff. The parties first discussed marriage in the early spring of 1945. In May 1945 they and their respective mothers appeared before a Catholic priest in Newark, at which time defendant informed the priest that she was single and had never been married. Later, in applying for a marriage license, she expressly stated over her signature and under oath that she was single, but left blank the question as to whether she had ever been divorced.
In September 1951, more than six years after the marriage, defendant informed plaintiff she had been married before and divorced, but refused to tell him the name of her first husband or give him any further information about the divorce. After unsuccessfully insisting that she do so, he separated from her on February 10, 1952. Plaintiff had inquired among defendant's relatives and obtained the name of "Burns" as that of her first husband. He then engaged an attorney to inquire into her past marital history. The inquiry produced no further information. Plaintiff subsequently obtained the correct name of the first husband and gave it to his attorney who, on further search of the records, obtained proof of defendant's prior marriage and of the subsequent entry of the decree nisi and the final decree in the Byrne divorce proceedings. The attorney gave this information to plaintiff sometime during January or February 1953.
The trial court found as a fact that defendant had, before her marriage, held herself out as a single woman who had never been married, and that plaintiff believed her representations. The court also found that the first definite information plaintiff had of the fact that defendant's prior marriage had not yet been finally dissolved when the parties married on June 24, 1945, was when his attorney gave him the results of his investigation early in 1953.
*508 Defendant testified that before her marriage to plaintiff she informed him of her earlier marriage and the three children resulting from that union, and the plaintiff had said it didn't matter. She further testified she told plaintiff there was a divorce proceeding pending which had been instituted by her first husband; that she couldn't get married "until there was other papers I guess served on me"  until she was divorced; and that plaintiff's response had been that it made no difference. She stated that upon receiving the decree nisi through the mails she exhibited it to plaintiff; she thought the decree nisi was a final dissolution of her prior marriage, and plaintiff "must have thought the same thing." Defendant admitted that in May 1945 she had told the priest she was single and had never been married, and that she had made the same statement in the marriage license application, but explained that these representations, while false, were made at plaintiff's request because he didn't want his family to know she had been married. The trial judge flatly stated he did not believe defendant's testimony. On the contrary, he found from the proofs that defendant had in fact concealed her prior marriage from plaintiff, that plaintiff never learned of the marriage until sometime in 1951, and never learned until a year or so after he left defendant on February 10, 1952 that she had a husband living when he married her.
Defendant argues that the findings of fact by the trial court were contrary to the weight of the evidence. We do not agree. On a review of a cause involving issues of fact not determined by the verdict of a jury, we are enjoined to give due regard to the opportunity of the trial court to judge the credibility of witnesses. R.R. 1:5-3(a), 2:5. In a matrimonial action as strongly contested as this one was, we must readily acknowledge the superior advantage of the trial court in judging of credibility. Where the findings of a trial court are supported by competent, reasonably credible evidence, they will not be disturbed. Pratico v. Rhodes, 32 N.J. Super. 178, 185-6 (App. Div. 1954). Such is the case here. Our independent review of the entire record does not *509 persuade us that the trial court's findings of fact were contrary to the weight of the evidence.
The trial court concluded as a matter of law that: (1) the ceremonial marriage between the parties was and is void; (2) there was not and could not be a common law marriage, notwithstanding the fact that they went through a ceremonial marriage, resided together as husband and wife for some years, and children were born of the marriage, because L. 1939, c. 227 (N.J.S.A. 37:1-10) abolished common law marriages in this State; (3) under R.S. 9:15-2 the infant children of the marriage are legitimate even though the ceremonial marriage of the parents be anulled; (4) it cannot be said under the proofs that plaintiff is estopped by his conduct or that relief should be denied him because he comes into equity with unclean hands; and (5) giving due weight to the provisions of N.J.S. 2A:34-1, a judgment of nullity would not be against the best interests of the children of the marriage. By judgment nisi entered May 27, 1954, defendant's counterclaim was dismissed and the pretended marriage between the parties declared a nullity; the judgment of nullity was held not to be against the interests of the children of the marriage since R.S. 9:15-2 declared them legitimate notwithstanding the annulment of the marriage; custody of the children was awarded to defendant, and plaintiff directed to pay defendant $15 a week for the support and maintenance of each of them. This appeal ensued.
Defendant first argues that the trial court's application of the provisions of L. 1939, c. 227 (N.J.S.A. 37:1-10) to the facts in this case was erroneous. Prior to the enactment of 1939, R.S. 37:1-10 read as follows:
"Nothing in this chapter shall be deemed or taken to render any common law or other marriage, otherwise lawful, invalid by reason of the failure to take out a [marriage] license as herein provided."
Before the passage of L. 1939, c. 227 a valid marriage could be contracted per verba de praesenti without a ceremony and without a license. Atlantic City R.R. Co. v. Goodin, 62 *510 N.J.L. 394 (E. & A. 1898); Jackson v. Jackson, 94 N.J. Eq. 233 (E. & A. 1922); Conkling v. Conkling, 117 N.J. Eq. 218 (E. & A. 1934), 10 N.J. Practice (Herr, Marriage, Divorce and Separation) (1950), § 39, p. 42.
The rule generally followed by our courts was that stated in 104 A.L.R. 12, viz.:
"* * * if parties desire marriage and do what they can to render their union matrimonial, but one of them is under a disability, their cohabitation thus matrimonially meant, and continued after the disability is removed, will, in law, make them husband and wife from the moment that such disability no longer exists, although there are no special circumstances to indicate that the parties expressly renewed their consent or changed their mode of living after the removal of the impediment."
Chamberlain v. Chamberlain, 68 N.J. Eq. 414 (Ch. 1905), affirmed 68 N.J. Eq. 736 (E. & A. 1905); Robinson v. Robinson, 83 N.J. Eq. 150 (Ch. 1914), affirmed 84 N.J. Eq. 201 (E. & A. 1915); Dolan v. Wagner, 96 N.J. Eq. 298 (E. & A. 1924); Burger v. Burger, 105 N.J. Eq. 403 (Ch. 1929); Margulies v. Margulies, 109 N.J. Eq. 391 (Ch. 1931); Tasto v. Tasto, 4 N.J. Super. 547 (App. Div. 1949); and see Tegenborg v. Tegenborg, 26 N.J. Super. 467 (App. Div. 1953).
Under this rule the condition of society with respect to the marital status was often one of uncertainty. Time and again courts were presented with claims of purported marriages and, since no official marriage record was required, it was sometimes difficult to disprove what probably must have been a fraudulent claim of marital status. Concubinage was encouraged. The problems of legitimacy and inheritance of the offspring of such relationships were continually before the courts. In certain limited areas of society, the attitude toward marriage was likely to be one of indifference. See, generally, Keezer, Marriage and Divorce (3rd Ed., Morland, 1946), chap. 2, pp. 34-59.
Following the example of many of our sister states, the New Jersey Legislature enacted L. 1939, c. 227 (N.J.S.A. 37:1-10) which provided:
*511 "Nothing in this chapter shall be deemed or taken to render any common law or other marriage, otherwise lawful, contracted before December first, nineteen hundred and thirty-nine, invalid by reason of the failure to take out a license as herein provided. But no marriage contracted on and after December first, nineteen hundred and thirty-nine, shall be valid unless the contracting parties shall have obtained a marriage license as required by section 37:1-2 of this Title, and unless, also, the marriage, after license duly issued therefor, shall have been performed by or before any person, religious society, institution or organization authorized by section 37:1-13 of this Title to solemnize marriages; and failure in any case to comply with both prerequisites aforesaid, which shall always be construed as mandatory and not merely directory, shall render the purported marriage absolutely void."
Defendant contends that the 1939 statute did not declare void all common-law marriages entered into after December 1, 1939, but merely added the requirements of a license and a ceremony to those required in common-law marriages theretofore recognized. Since these additional requirements were met and both parties considered themselves man and wife until early in 1953, she argues that there was no meretricious relation between them and a decision declaring their marriage valid and subsisting would be in conformity with the intention and purpose of the legislative enactment. The purpose of all marriage law being to promote family stability, secure the status of children, protect health and public morals, and assure the certainty and sanctity of marriage, the annulment granted in the instant case, she argues, would defeat that purpose.
In support of this contention, defendant calls upon the decision in Tasto v. Tasto, 4 N.J. Super. 547 (App. Div. 1949), a case wherein plaintiff wife sought and obtained support from her husband in the Juvenile and Domestic Relations Court. The parties had gone through a ceremonial marriage in Maryland in 1947, subsequent to the hearing in a divorce proceeding between defendant and his former wife but prior to the entry of final decree. The proofs were that at the time of the marriage plaintiff knew defendant had previously been married, but he told her he was divorced from his former wife. He did not disclose that he had no *512 final decree, and plaintiff married him in good faith, believing he was fully divorced. Defendant claimed plaintiff knew that his divorce would not become final until a few months after the marriage, but admitted that following the ceremony he always held plaintiff out as his wife and supported her and their children until he deserted her about a year and a half later. The court held there was a subsisting marriage and that when the impediment of the former marriage was removed "the intent and motives of the parties related back to the original date of the ceremonial marriage." We do not consider the Tasto decision as authority for defendant's position. In the first place, the court held that in view of the fact that defendant knew, or should have known, that he could not legally marry plaintiff until a final decree of divorce had been awarded, and further because plaintiff had no knowledge of the fraud perpetrated upon her but had every good intention of entering into a lawful marriage, it was appropriate that the doctrine of estoppel be invoked against defendant for his gross fraud. In addition to the fact that the case was decided upon estoppel principles, it should be noted that at no time was the court's attention called to the 1939 statute, nor did the court consider it. This is evident from a reading of the opinion and examination of the briefs submitted to the Appellate Division. State Library, 234 Superior Court, Appellate Division Briefs (1951-52).
Nor does Tegenborg v. Tegenborg, 26 N.J. Super. 467 (App. Div. 1953), support defendant's position. The decision in that case, written by Judge Francis, was fully explained by him in Danes v. Smith, 30 N.J. Super. 292 (App. Div. 1954), where he said (at page 299) that the problem posed in the Danes case  the same as is present here  was neither presented, decided, nor intended to be decided in Tegenborg. In the latter case the ceremonial marriage between the parties took place in Florida. When the impediment to the validity of the marriage was removed they continued to live together as husband and wife in that state for some time before they moved to New Jersey. Common law marriages are valid in Florida, and the courts of that state *513 have specifically followed the New Jersey rule set forth in Chamberlain v. Chamberlain, 68 N.J. Eq. 736 (E. & A. 1905). Jones v. Jones, 119 Fla. 824, 161 So. 836, 104 A.L.R. 1 (Sup. Ct. 1935). Since the Tegenborgs were legally husband and wife in Florida they occupied the same status here. Judge Francis emphasized that the court in Tegenborg had no intention of indicating what effect the 1939 statute would have had if the entire matter had been localized in New Jersey.
As observed in Danes v. Smith, above, 30 N.J. Super., at page 298, no case has yet been decided in our courts as to the effect of L. 1939, c. 227 (N.J.S.A. 37:1-10) on a situation where the parties complied with the formal requisites of license and ceremony in good faith, unconscious of an obstacle in the path of a valid marriage, and then continued to live together as man and wife after the removal of the bar. Although the court considered some of the implications of the 1939 law, it left unanswered the problem here presented.
Turning to the situation before us, the judgment nisi in the Byrne divorce proceedings did not terminate defendant's prior marriage: such a judgment in New Jersey is a conditional judgment of divorce and the marital status remains in full legal vigor until the expiration of the three-month period. Streader v. Streader, 17 N.J. Super. 123, 126 (App. Div. 1951); Sobel v. Sobel, 99 N.J. Eq. 376, 378 (E. & A. 1926); 12 N.J. Practice (Herr, Marriage, Divorce and Separation) (1950), § 1462, p. 23. The attempted marriage of the parties while defendant's prior marriage was still in full force and effect was and is a nullity. N.J.S. 2A:34-1(a); Dunn v. O'Day, 18 N.J. Misc. 679, 16 A.2d 195 (W.C.B. 1940); Foster v. Jarka Corp., 21 N.J. Misc. 47, 30 A.2d 47 (W.C.B. 1942); 10 N.J. Practice (Herr, Marriage, Divorce and Separation) (1950), § 28, p. 27; cf. Restatement, Conflict of Laws, § 130, p. 194, comment (a).
In our view, L. 1939, c. 227 (N.J.S.A. 37:1-10) does not recognize as a valid marriage the status occupied by the parties after the Byrne divorce decree became final on July *514 26, 1945. The Danes decision posed, but did not answer, the question whether the strong public policy manifested by the 1939 act overcame the strong public policy of the common law in favor of recognition of a marriage in the circumstances here present.
The statement attached to Assembly Bill No. 10, which became L. 1939, c. 227, is unusually comprehensive and clear in its exposition of the legislative purpose, which was "to abolish forever the privilege of contracting common law marriages in New Jersey," in line with the action of a majority of the states, and so abolish the "many abuses arising from common law marriages and the countless claims of marital relations under this loose form of matrimony * * *." The Legislature unquestionably had the authority to abrogate the common law doctrine, stated in the Chamberlain, Robinson, Dolan, Burger and other cases cited above, if it saw fit to do so. It unquestionably did when it passed the 1939 act.
The effect of the 1939 statute was considered in Brown v. United States, 72 F. Supp. 153 (D.C.N.J. 1947), affirmed 164 F.2d 490 (3rd Cir. 1947), cert. denied 333 U.S. 873, 68 S.Ct. 902, 92 L.Ed. 1149 (1948). The plaintiff there sought a judgment declaring her the lawful widow of Brown, a deceased veteran, and so entitled to the proceeds of his national service life insurance policy. Brown had previously married another woman who eventually instituted divorce proceedings against him in our former Court of Chancery and on April 5, 1943 obtained a decree nisi. Brown married plaintiff in May 1943 in New Jersey; in his marriage license application he swore he was single. The final decree in the divorce proceedings was not entered until July 6, 1943. After their marriage plaintiff and Brown lived as husband and wife until he entered the armed services. While in service he took out the policy in question, designating plaintiff as his principal beneficiary and his mother contingent beneficiary. He died when the policy was still in force. The federal agency having rejected plaintiff's claim to the policy, she instituted proceedings to be declared Brown's lawful widow. Plaintiff claimed she had married in good faith and *515 thereafter lived with Brown as husband and wife, so that a common law relation was created within the provisions of the 1939 act. She argued, as does defendant here, that a strict construction of the 1939 statute, which was in derogation of common law, would exclude from its operation all cases where a marriage license had been obtained, followed by a ceremonial marriage.
After referring to the New Jersey law before the passage of the 1939 act, the federal court observed that however compelling the reason in any particular situation or however grave the hardship, to adopt plaintiff's contention that the statute did not apply to her situation would contravene the logical and legal requirements of the language of the act and the purposes for which it was passed. The court declared plaintiff's marriage a nullity and said (72 F. Supp., at page 155):
"* * * No amount of civil or religious ceremonies even after the issuance of a license can make it [the marriage] anything else.
The contention of the defendant would have the removal of the impediment to a legal marriage constitute a validation of the originally invalid ceremonial marriage, which is nowhere provided for in the Statute. It would by no means be said to revive and legitimize a null and void marriage under any circumstances, for a nullity being something which never existed cannot be `revived.'
Whatever merit the defendant's claim may be said speciously to possess, is dissipated when it is realized that to lend weight to it the ceremony must be said to be operative not in the present but in the future. At the time of its performance the marriage was null and void and the effectiveness of such ceremony was not saved for application in future contingencies."
The ceremonial marriage in this case having been a nullity at the very moment of its performance, defendant's contention that a marital relation still exists can be sustained only on the theory of a common law marriage. This would be directly contrary to the legislative intention expressed by the 1939 act. The fact that the parties once went through a marriage ceremony cannot raise their relationship to the dignity of a marital status legally recognized. It has been observed that
*516 "The doctrine that cohabitation continued after the removal of the impediment to an invalid marriage validates the marriage is not based on a theory of ratification of the earlier marriage, but on the theory that a new common-law marriage is contracted after the removal of the impediment to the marriage of the parties, and the rule is therefore without application where informal or common-law marriages are not recognized, but it may be provided by statute in a jurisdiction which does not recognize common-law marriages that a marriage invalid because of the prior subsisting marriage of one of the parties shall be deemed valid after the removal of the impediment by death or divorce if the parties cohabit in good faith after the removal of the impediment and the marriage was entered into by at least one of the parties in good faith." (55 C.J.S., Marriage, § 36, p. 881)
It is for the Legislature to provide that alleged marriages such as the one under consideration shall be sustained in the instant circumstances. It has not chosen to do so, although the opportunity was present in the revision of Title 2A, adopted by L. 1951, c. 344. Such remedial legislation is not unknown. Massachusetts has provided that
"If a person, during the lifetime of a husband or wife with whom the marriage is in force, enters into a subsequent marriage contract with due legal ceremony and the parties thereto live together thereafter as husband and wife, and such subsequent marriage contract was entered into by one of the parties in good faith, in the full belief * * * that the former marriage had been annulled by a divorce, or without knowledge of such former marriage, they shall, after the impediment to their marriage has been removed by the death or divorce of the other party to the former marriage, if they continue to live together as husband and wife in good faith on the part of one of them, be held to have been legally married from and after the removal of such impediment, and the issue of such subsequent marriage shall be considered as the legitimate issue of both parents. (Annotated Laws of Mass., Marriage, c. 207, § 6)
Cf. Code of Va. (1950), Domestic Relations, §§ 20-42.
We recognize the anomaly which results from our holding that a common law marriage is barred by the statute in the instant circumstances. The Danes case, above, 30 N.J. Super., at page 299, pointed out that where parties to a ceremonial marriage enter into the relation with knowledge that an impediment exists, they are barred by estoppel or unclean hands from asserting its invalidity. Their status *517 is unaffected by the statute. But where two persons in good faith go through a ceremonial marriage unaware of an invalidating obstacle, and the obstacle is subsequently removed, continuance of cohabitation matrimonially meant will accomplish nothing for them. Their state will still be concubinage. Although it has been suggested that in the latter case there is social and legal justification for the recognition of common law marriage, Annual Survey of American Law, 1952, p. 665, the public policy of this State as manifested in N.J.S.A. 37:1-10 must prevail until the Legislature itself has enacted an exception similar to that of Massachusetts.
It is urged that annulment would be contrary to the best interests of the children of the parties. Our attention is invited to the final paragraph of N.J.S. 2A:34-1:
"No judgment of nullity shall be made where a child of the parties has been born, either before or after the marriage, or is likely to be born, unless the court upon an examination of all the facts of the case shall be of the opinion that such judgment will not be against the best interests of the child."
The Legislature has provided in R.S. 9:15-2 that any child born of a ceremonial marriage is legitimate notwithstanding the marriage be thereafter annulled or declared void, and that such child "shall enjoy the status and rights to which he would have been entitled had he been born of a valid marriage." The trial court considered the welfare of the children before concluding that plaintiff was entitled to a judgment of annulment. It expressly found that nullifying the alleged marriage would not be against their best interests.
Defendant argues that although the children are legitimate because of the statute, there remain the social implications and stigma of being denied the legitimacy normally and naturally conferred by a ceremonial marriage, citing Caruso v. Caruso, 104 N.J. Eq. 588, 593 (Ch. 1929), where the chancellor said he deemed it his duty not to annul a marriage when that result may be avoided, "and thus place upon the innocent child the stigma of bastardy, save as it may be *518 made legitimate by legislative fiat." Suffice to say, the facts and problem posed in Caruso were entirely different from those in this case.
Our courts have always been sensitive to the social, economic and psychological factors which affect the welfare of children. These important considerations were undoubtedly fully considered by the trial court when it gave the children into the custody of their mother and provided for their support.
Defendant seeks to defeat plaintiff's demand for annulment by asserting that he comes into court with unclean hands. She charges him with unconscionable conduct, claiming that he left the marital home without justifiable reason and thereafter failed to support her and the children adequately, but forced them to seek financial aid from the local welfare department. She further charges that the real reason for his leaving was his interest in another woman. These matters were explored in the course of the hearings below, and considered by the trial court in reaching its decision.
The question which must concern us in determining whether plaintiff was guilty of inequitable conduct is: Did he go through a ceremonial marriage with defendant, or continue to live with her as man and wife, knowing or having reason to know of the existence of an impediment to lawful wedlock? Cf. Danes v. Smith, 30 N.J. Super. 292 (App. Div. 1954); Tonti v. Chadwick, 1 N.J. 531 (1949); Smith v. Hrzich, 1 N.J. 1 (1948); Keller v. Linsenmyer, 101 N.J. Eq. 664 (Ch. 1927); Dolan v. Wagner, 96 N.J. Eq. 298 (E. & A. 1924); Tyll v. Keller, 94 N.J. Eq. 426 (E. & A. 1923).
There is nothing in the record proving that plaintiff was guilty of any knowledge of, or unconscionable conduct in connection with, the impediment which existed in this case  and the trial court expressly so found. Instead, it concluded that defendant was the one who was guilty of unconscionable conduct in holding herself out as a single woman who had never before been married, and in misrepresenting her status to the Church as well as to the public authorities when applying for a marriage license.
*519 Plaintiff separated himself from the marital home long before learning of the existence of the impediment to a legal marriage. The fact that he may not have adequately provided for defendant and the children cannot give validity to a marriage void ab initio so as to defeat his nullity action.
In passing, we find the testimony as to plaintiff's alleged interest in another woman inconclusive. The trial court found it unnecessary to decide this charge brought by defendant, and we consider it not proved.
The judgment is affirmed.