CHARLES L. DEANEY, PLAINTIFF-RESPONDENT, v. THE LINEN THREAD CO., INC., A CORPORATION, DEFENDANT-APPELLANT, AND BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY, STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued October 3, 1955—Decided November 7, 1955.

Mr. *Gerald E. Monaghan* argued the cause for appellant (*Messrs. Morrison, Lloyd & Griggs,* attorneys; *Mr. Monaghan* of counsel).

Mr. *George Miller* argued the cause for respondent Board of Review.

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   The question is whether disability benefits for which an employee is eligible under the Temporary Disability Benefits Law are to be reduced by the amount of old age insurance benefits he is concurrently receiving under Title II of the Federal Social Security Act, 42 *U. S. C. A.* § 401 *et seq.*

The Temporary Disability Benefits Law provides protection against wage loss suffered because of inability to work due to illness.   Deaney, aged 74, for 18 years an employee of the Linen Thread Co., Inc., was hospitalized in January 1955 for the removal of an eye cataract.   The Chief of State Plan Disability Benefits held him to be eligible for disability benefits of $30 weekly, less, however, the federal old age insurance benefits he was concurrently receiving as an eligible individual over 72 years of age.   On Deaney's appeal the Board of Review held that he was entitled to the benefits without deduction.   The employer sought review in the Superior Court, Appellate Division, under *R. R.* 4:88–8, and we certified the proceeding here on our own motion.

The Board of Review questions whether the employer is entitled to judicial review when, although given due notice, the company did not appear at the hearing before the Board nor apply for a rehearing pursuant to Board Rule 4.02(*d*) after the Board announced its disagreement with the holding of the Chief of State Plan Disability Benefits.   Under our rule, *R. R.* 4:88–14, where it is manifest that the interests of justice require, proceedings in lieu of prerogative writ

under *R. R.* 4:88 may be maintained despite the fact that administrative remedies have not been exhausted. The policy of the rule not to entertain a proceeding in advance of the exhaustion of administrative remedies is firmly adhered to in our practice, but an exception is recognized when, as here, the question presented is solely one of law raising an important question of statutory construction. *Nolan v. Fitzpatrick,* 9 *N. J.* 477 (1952).

The Temporary Disability Benefits Law was enacted by *L.* 1948, *c.* 110, *N. J. S. A.* 43:21–25 *et seq.* The last sentence of section 6 of the original act, *N. J. S. A.* 43:21–30, provided expressly for the reduction of benefits in the amount of any primary insurance benefits being paid to the claimant as federal old age insurance benefits. The sentence read:

> "Disability benefits otherwise required hereunder shall be reduced by the amount of any primary insurance benefits which are being paid to such individual under Title II of the Federal Social Security Act, and by the amount of any payments of annuities, pensions or permanent disability benefits or allowances under a policy or program of an employer from whose service he has been retired, in accordance with such regulations as the commission shall prescribe."

But a 1952 amendment of section 6, *L.* 1952, *c.* 190, replaced that sentence with a new sentence which provides:

> "Disability benefits otherwise required hereunder shall be reduced by the amount paid concurrently under any governmental or private retirement, pension or permanent disability benefit or allowance program to which his most recent employer contributed on his behalf."

Appellant argues that, although mention is not made in the new sentence of federal old age insurance benefits, they are included in "any governmental * * * retirement, pension or permanent disability benefit or allowance program to which his most recent employer contributed on his behalf."

It is clear that both new and old provisions have in view the older worker who is supplementing his old age insurance benefits, or his retirement benefits from an employer from whose service he was retired, with earnings from new employ-

ment. Old age benefits are not payable until age 65, and up to age 72 an individual may earn up to $1,200 annually without diminution of those benefits, and at age 72 and thereafter receives full benefits however much he may earn. 42 *U. S. C. A.* 402, 403(*e*)(1), 403(*e*)(2)(*C*). Retirement from private or public employment may be at different ages, according to the provisions of the employer's retirement plan (a legislative plan in the case of public employment), and the benefits may take any of several forms. The more usual forms, retirement, pension, permanent disability or allowance, are mentioned in the new and the old sentences of section 6.

Obviously the federal old age insurance benefits program is not a "permanent disability" program; and we entertain great doubt that, in precise nomenclature, it can be properly classified as either a "retirement," a "pension," or an "allowance" program. It does not provide benefits for long service in a particular employment, or with a single employer, but is, as is explicit in its name, an insurance program. Employment is its basis, but employment without regard to any relation of the employee with a particular employer. The benefits are paid from the "Federal Old Age and Survivors Trust Fund" created on the books of the Treasurer of the United States. The Social Security Act, 42 *U. S. C. A.*, *sec.* 401, appropriates to the Fund "amounts equivalent to 100 per centum of  *  *  *  the taxes imposed" by a separate and distinct act, The Federal Insurance Contribution Act, 26 *U. S. C. A., sec.* 1400 *et seq., Internal Revenue Code of* 1939, now *sec.* 3101 *et seq.*, of the *Internal Revenue Code of* 1954. There is imposed on the income from wages of every individual employee covered by the act a tax, deductible by his employer for the time being, and there is imposed on the employer an excise tax measured by the wages he pays, not to particular employees, but to the aggregate of employees in his employ in a calendar year. *Internal Revenue Code of* 1954, *secs.* 3102, 3111. The benefits paid out to an employee after age 65 are thus the proceeds of the insurance purchased in that way during his employment before reaching that age.

The distinction between them and the benefits received for long service with a particular employer is apparent.

Our task here, however, is to determine whether the Legislature had the distinction in mind in substituting the new for the old provision of section 6. It is abundantly clear that the old provision made the distinction, for it dealt separately with old age insurance benefits and retirement benefits; reductions in the amount of temporary disability benefits were to be made in (1) the "amount of any primary insurance benefits which are being paid to such individual under Title II of the Federal Social Security Act," and (2) in the "amount of any payments of annuities, pensions or permanent disability benefits or allowances under a policy or program of an employer [the word is not qualified and necessarily means either a private employer or a governmental employer] from whose service he has been retired."

■ In reaching the meaning of the amendatory language "the court must look to the prior law," *Hasbrouck Heights Hospital Association v. Borough of Hasbrouck Heights,* 15 *N. J.* 447, 453 (1954), and of controlling significance here, in our view, is the fact that the Legislature carried into the amendment substantially the same words from the prior law which were solely descriptive of employer retirement benefits, *viz.,* "retirement, pension or permanent disability benefit or allowance program." This is strong evidence that the Legislature intended the amendment to apply only to benefits under employer retirement programs and to exclude old age insurance benefits. In that view, the prescription in the amendment of "any governmental or private" program simply makes more explicit what was true of the prior law, that is, that benefits under retirement programs of both governmental and private employers were included.

■ The amended statute now limits reductions, however, to benefits concurrently paid to the claimant under programs "to which his most recent employer contributed on his behalf." Under the prior law reductions were made without regard to whether such contributions were being made by the claimant's most recent employer; the amount of any pension

being received, for example by a retired policeman or a retired railroad engineer who took a job with a manufacturer, would reduce the temporary disability benefit to which he would be entitled if he suffered a disability while in the manufacturer's employ. Under the amendment that would probably not be the case, as it is hardly likely that the manufacturer, the claimant's "most recent employer," would be contributing to a municipal or railroad pension. Except for the rare situation of the claimant who has returned to the service of his former employer after being retired by him, it is difficult to think of a retirement benefit which will qualify for reduction under the amendment. But does this mean that the amendment must be interpreted to embrace old age insurance benefits, or be meaningless? We think not. We will not impute to the Legislature the incongruous procedure of dropping the express reference to the Social Security Act from the old law only to say the same thing indirectly and obscurely in the new. Rather, the substantial contraction of employer retirement benefits which now result in reductions under the amendment is itself cogent evidence that the Legislature was drastically limiting the benefits occasioning reductions, and as part of that plan repealed the requirement for reduction in the amount of old age insurance benefits.

We have been able to reach our conclusion from a comparison of the present with the former law and without attaching any particular significance to the legislative history of the 1952 amendment or the explanatory statement appearing on the bill which introduced the amendment. This does not mean, however, that the court has shut its eyes to either. The constraints upon the interpretative process against reference to introducers' statements adverted to in *Board of National Missions v. Neeld*, 9 *N. J.* 349, 356 (1952), have given way in favor of the approach to the use of introducers' statements fostered by Mr. Justice Jacobs in his concurring opinion in that case. See *State v. Low*, 18 *N. J.* 179, 184 (1955), and cases collected in *Sands, Developments in the Field of Legislation*, 10 *Rutgers L. Rev.* 2, 21 (1955). The bundle of extrinsic aids which may be consulted in the interpretation

of a statute includes the sponsor's statement which accompanies the legislative bill, but, as in the case of other legislative materials, a considered judgment is exercised in determining the weight which will be attached to it; the introducer's statement, too, may be contradictory, ambiguous or otherwise without substantial probative value in determining legislative meaning. As was said by Mr. Justice Jacobs, 9 *N. J.*, at *page* 361:

"* * * The introducer's statement clearly constitutes relevant evidence on any proper issue as to the legislative purpose, meaning or intent; it sets forth the interpretation of the draftsman or sponsor of the legislation, is circulated amongst his fellow members of the Senate or Assembly, as the case may be, and becomes a matter of record available for inspection by all, then and thereafter. It may be very complete and embody a fully documented narrative of purpose entitled to substantial consideration. See *e. g.*, Assembly No. 15 introduced on March 21, 1952 and bearing a statement which is in form comparable to a detailed committee report. On the other hand it may be inadequate and perhaps misleading and entitled to little consideration."

The value of reference to the legislative history and the introducer's statement in the instant case lies in the confirmation of our conclusion found in both. The opinion of the Board of Review below notes that the amendment originated in 1952 Senate Bill No. 252 which was introduced at the request of the Division of Employment Security. In its original form Senate Bill No. 252 proposed the deletion of the sentence quoted above of the former law governing reductions and, thus, the outright repeal of the reduction requirement both as to old age insurance benefits and employer retirement benefits. The introducer's statement explained that the repealer proposed "to bring the Temporary Disability Benefits Law into conformity with the Unemployment Compensation Law with respect to individuals receiving benefits under the Social Security Act or annuities, pensions or permanent disability benefits from an employer. The Division of Employment Security has discovered less than one hundred such cases in a year's operation and the adminis-

trative cost of seeking them out has almost equalled the amount saved." The Legislature in substituting a new provision did not fully follow the Division's recommendation but plainly did adopt the Division's proposal to the extent of repealing the requirement for a reduction in the amount of old age insurance benefits.

Affirmed.

VANDERBILT, C. J. (dissenting). I join in the dissent of Mr. Justice HEHER, but in addition I cannot subscribe to the view of the majority that a statement attached to a bill by its introducer aids in any way in the determination of the intent of the Legislature with respect to the measure passed. This unreliable form of extrinsic "aid" to the determination of the legislative idea intended by the text of a statute has been slowly finding its way into our judicial expressions, *De Vita v. Housing Authority of City of Paterson*, 17 *N. J.* 350, 111 *A.* 2d 497 (1955); *Rogers v. Dept. of Civil Service*, 17 *N. J.* 533, 111 *A.* 2d 894 (1955); *State v. Hotel Bar Foods*, 18 *N. J.* 115, 112 *A.* 2d 726 (1955); *State v. Low*, 18 *N. J.* 179, 113 *A.* 2d 169 (1955); *Dacunzo v. Edgye*, 33 *N. J. Super.* 504, 111 *A.* 2d 88 (*App. Div.* 1955); *In re 301–317 Clinton Avenue*, 35 *N. J. Super.* 136, 113 *A.* 2d 208 (*Cty. Ct.* 1955).

Such a statement attached to a bill may perchance—but by no means certainly—be indicative of the purpose intended by the introducer. Many legislative bills, if not indeed most of them, are not prepared personally by the introducer but by some constituent of his who wishes the bill introduced for reasons of his own. In all of these cases the statement attached to the bill reflects not the introducer's purpose but at most the intention of the introducer's constituent. This sponsoring constituent is no disinterested party; he has his own personal motives for getting the bill introduced and passed. He may not be entirely frank in stating these reasons as a legislator would be expected to be in the case of statements made by him personally on bills which he prepared personally. If the real sponsor of a bill knows that his state-

ment is likely to be used in construing the bill after its enactment, the temptation to be artful in his own interest in preparing his statement would in many cases prove irresistible, especially as the sponsor of a bill in most cases remains anonymous. In these circumstances, the bill might clearly say one thing and the statement attached to the bill indicate something quite different.

But the vice of relying on the statement attached to a bill goes further. The statement attached to the bill on its introduction appears only on the bill as it is first printed in the house where it is introduced. On the bill being referred to a committee, the bill as first introduced with the statement attached to it is immediately superseded by an official committee reprint, without the statement appearing, and thereafter the statement never appears in the house where the bill was introduced. Nor after the bill has passed the house where it is introduced does the statement ever appear on the bill as it finds its way through the other house. And finally, it does not come before the Governor when it is presented to him for his approval. Officially, then, the statement is not before the Legislature when the bill comes up for a vote.

But it is urged that the introducer's statement is known to all the members of the Legislature in fact, if not officially, but if one has ever seen the Legislature in action at a busy session this would seem to be as untrue in fact as it is officially. When one bears in mind the hundreds of bills which are introduced each year in our Legislature and which are passed upon in a relatively small number of sessions, often under suspension of rules, and (except in the most unusual cases) without any committee reports stating the reasons for and against the passage of a bill, it is fanciful to suggest that these introducing statements reach the hands, not to mention the minds, of all of the members of both houses. The situation is quite different from that which prevails in some legislative bodies, as, e. g., the Congress of the United States, where detailed committee reports are the normal course of procedure on every bill called up for vote and where there is a

full stenographic record which is promptly printed the next day in *The Congressional Record* of all legislative proceedings on the floor of both houses and where committee hearings are also published. Here we not only very seldom have committee reports but we do not have any stenographic record taken of what is said on the floor of each house or copies thereof printed. Our legislative record, aside from the bills and the amendments thereto themselves, is at most a skeletonized account of the proceedings which tells practically nothing concerning the intent of the members of the Legislature except as may be gathered from their votes.

Since these usual sources of legislative intention available in the construction of federal statutes are lacking in the case of state enactments, see *Filsop, Legislative Records as Extrinsic Aids in State Courts* 6–7 (unpublished summary of 1940 survey conducted for the Legislative Drafting Research Fund of Columbia University), all sorts of difficulties can be contemplated if such non-legislative material is accepted as a measure of the meaning intended by the State Legislature of the particular words used when there is absolutely no basis for accepting it as such.

It has long been a rule of law binding English courts that it is not permissible to use legislative statements in ascertaining the meaning of a statute, *Holdsworth, Some Makers of English Law* (Cambridge University Press) *pp.* 294–296; see also 1 *Blackstone Comm.* 85–92. Relaxation of the rule and the turn to extrinsic aids to construction in this country first came in the form of federal judicial pronouncements that when a statute was ambiguous, committee reports or legislative debates could be examined for what light they might shed on the subject, *Holy Trinity Church v. United States,* 143 *U. S.* 457, 464–465, 12 *S. Ct.* 511, 36 *L. Ed.* 226 (1892); *The Delaware,* 161 *U. S.* 459, 472, 16 *S. Ct.* 516, 40 *L. Ed.* 771 (1896); (*cf. United States v. Trans-Missouri Freight Ass'n,* 166 *U. S.* 290, 318, 17 *S. Ct.* 540, 41 *L. Ed.* 1007 (1897)); *Buttfield v. Stranahan,* 192 *U. S.* 470, 495, 24 *S. Ct.* 349, 48 *L. Ed.* 525 (1904); *Binns v. United States,* 194 *U. S.* 486, 495, 24 *S. Ct.* 816, 48 *L. Ed.* 1087 (1904);

*United States v. St. Paul M. & M. Ry. Co.*, 247 U. S. 310, 316–318, 38 *S. Ct.* 525, 62 *L. Ed.* 1130 (1918); *Duplex Printing Press Co. v. Deering*, 254 U. S. 443, 41 *S. Ct.* 172, 65 *L. Ed.* 349 (1921); see also dissenting opinion of Mr. Justice Frankfurter and Appendix A thereof in *Commissioner of Internal Revenue v. Estate of Church*, 335 U. S. 632, 667, 687–689, 69 *S. Ct.* 322, 93 *L. Ed.* 288 (1949); *United States v. American Trucking Ass'ns*, 310 U. S. 534, 543, 60 *S. Ct.* 1059, 84 *L. Ed.* 1345 (1940); *United States v. Dickerson*, 310 U. S. 554, 562, 60 *S. Ct.* 1034, 84 *L. Ed.* 1356 (1940); *United States v. Wrightwood Dairy Co.*, 315 U. S. 110, 125, 62 *S. Ct.* 523, 86 *L. Ed.* 726 (1942). This development was not without qualification. In the *Wrightwood* case, *supra*, it was held that little, if any, weight could or would be given to statements by members of the Congress not in charge of the legislation in question, the indication being that the less reliable the source the less the reliance that should be placed thereon; compare *Securities and Exchange Commission v. Robert Collier & Co.*, 76 *F. 2d* 939 (2nd Cir. 1935); and for instances of development in state courts, see *Morgan v. Fayette County Bd. of Ed.*, 294 *Ky.* 597, 172 *S. W. 2d* 64 (*Ct. App.* 1943); *Hood Rubber Co. v. Commissioner of Corp. and Taxation*, 268 *Mass.* 355, 167 *N. E.* 670, 70 *A. L. R.* 1 (*Sup. Jud. Ct.* 1929); *Third District Land Co. v. Toka*, 170 *So.* 793 (*La. Ct. App.* 1936); *Woollcott v. Shubert*, 217 *N. Y.* 212, 111 *N. E.* 829, *L. R. A.* 1916E, 248 (*Ct. App.* 1916). In *Bass v. Allen Home Improvement Co.*, 8 *N. J.* 219 (1951), one of the parties attempted to introduce into evidence the testimony of the member of the Legislature who introduced and sponsored the legislation under review. Although his testimony was objected to, he was allowed to give it. On appeal this court did not hesitate to reverse on the ground that the introducer's testimony was not a proper method of construing a statute. It would seem, however, that the testimony of the introducing legislator would have a higher probative value than his mere statement, because it would be subject to cross-examination which the statement, of course, is not.

The danger that attaches to the use of legislative history even when it is founded on elaborate committee reports submitted to Congress before legislative action is taken and even where every word said on the floor of either house is stenographically reported and promptly printed the next day and where the hearings of witnesses taken before Congressional committees are speedily available, has been clearly pointed out by Mr. Justice Robert H. Jackson:

"I, like other opinion writers, have resorted not infrequently to legislative history as a guide to the meaning of statutes. I am coming to think it is a badly overdone practice, of dubious help to true interpretation and one which poses serious practical problems for a large part of the legal profession. The British Courts, with their long accumulation of experience, consider Parliamentary proceedings too treacherous a ground for interpretation of statutes and refuse to go back of an Act itself to search for unenacted meanings. They thus follow Mr. Justice Holmes' statement, made, however, before he joined the Supreme Court, that 'We do not inquire what the *legislature* meant, we ask only what the *statute* means.'

And, after all, should a statute mean to a Court what was in the minds but not put into the words of men behind it, or should it mean what its language reasonably conveys to those who are expected to obey it?

The Constitution evidently intended Congress itself to reduce the conflicting and tentative views of its members to an agreed formula. It was expected to speak its will with considerable formality, after deliberation assured by three readings in each House. Its exact language requires executive approval, or enough support to override a veto. How far, then, should this formal text and context be qualified or amplified by expressions of one or several Congressmen in reports or debates which did not find place in the enactment itself?

There is a tendency to decrease the measure of the ambiguity which originally justified resort to legislative history. But even if the ambiguity is genuine and substantial, do we find more solid ground by going back of it? It is a poor cause that cannot find some plausible support in legislative history, which often includes tentative rather than final views of legislators or leaves misinterpretation unanswered lest more definite statements imperil the chance of passage. * * *" 34 *A. B. A. J.* 535, 537 (1948)

All of these doubts apply in greatly magnified form when reliance is placed on an introducer's statement which may or may not have been drawn by the introducer and which

may have been drawn by some constituent of his for the purpose of misleading the Legislature and which promptly disappears from view as soon as the bill is introduced and is never officially—and in most cases not actually—seen by the legislators from then on.

Our task is to determine *legislative* intent as appears from the words of the statute. The difficulty with the view advocated by the majority is that it seeks to obtain that intent and meaning from the source the Legislature did not have in mind.

I would reverse.

HEHER, J. (dissenting). The outstanding policy of the original statutory provision was to curtail the "duplication" of benefits. The amendment of 1952 was in furtherance and not in derogation of the principle. The act of 1948, *N. J. S. A.* 43:21–30, directed that the disability benefits therein provided shall be reduced "by the amount of any primary insurance benefits which are being paid to such individual under Title II of the Federal Social Security Act, and by the amount of any payments of annuities, pensions or permanent disability benefits or allowances under a policy or program of an employer from whose service he has been retired, in accordance with such regulations as the commission shall prescribe." The amendment, *L.* 1952, *c.* 190, provides that such disability benefits shall be reduced "by the amount paid concurrently under any governmental or private retirement, pension or permanent disability benefit or allowance program to which his most recent employer contributed on his behalf."

The absence of specific mention of Title II of the Federal Social Security Act in the amendment of 1952 does not signify a different treatment of benefits of this class. Under the act of 1948, the prescribed reductions were in two categories: first, "any primary insurance benefits" payable under Title II of the Federal Social Security Act; second, payments of annuities, pensions or permanent disability benefits or allowances "under a policy or program of an employer

from whose service he has been retired." The amendment enlarged the deductible class to include "concurrent" payments "under any governmental or private retirement, pension or permanent disability benefit or allowance program to which his most recent employer contributed on his behalf." Thus, the amendment is in terms embracive of all "governmental" and "private" retirement, pension or permanent disability benefit or allowance programs. The amendment broadened the provision to include governmental benefits of the given classes, benefits not within the provision of the earlier statute, save those payable under the Social Security Act. And so there was no need to make specific mention of social security benefits, and no suggestion of exclusion from the deductible category by such omission, for social security benefits are within the generic class.

The obvious policy is the key to the understanding of the provision; and the interpretive process is controlled accordingly. "Of two constructions, either of which is warranted by the words of the amendment of a public act, that is to be preferred which best harmonizes the amendment with the general tenor and spirit of the act amended." *Lewis' Sutherland Statutory Construction (2d ed.), section* 489, citing *Griffin's Case, Chase's Dec.* 364. In view of the general purport of the amendment, a purpose to exclude social security benefits from the particular class should be expressed in clear and indubitable terms and not left to surmise or conjecture. *Hoffman v. Hock,* 8 *N. J.* 397 (1952).

In affirming the constitutional sufficiency of the Federal Social Security Act, Justice Cardozo said that the benefits thus provided "are of two types, first, monthly pensions, and second, lump sum payments, the payments of the second class being relatively few and unimportant." *Helvering v. Davis,* 301 *U. S.* 619, 57 *S. Ct.* 904, 81 *L. Ed.* 1307 (1936). And Justice Reed observed that the purpose of the Federal Old Age Benefits of the Social Security Act "is to provide funds through contributions by employer and employee for the decent support of elderly workmen who have ceased to labor."

*Social Security Board v. Nierotko,* 327 *U. S.* 358, 66 *S. Ct.* 637, 90 *L. Ed.* 718 (1945).

But if it be assumed that social security benefits are not within the statutory term "pension" program, they are yet payments made under a governmental "allowance program." The words "permanent disability" qualify "benefit," the word in immediate association, and not the subsequent word "allowance," separated as they are by the disjunctive "or." To hold that the modification covers both "benefit" and "allowance" would be to deprive "allowance" of any real significance or meaning.

And I join in the dissent of Chief Justice VANDERBILT. I would reverse the determination of the Board of Review.

*For affirmance*—Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—5.

*For reversal*—Chief Justice VANDERBILT, and Justice HEHER—2.